**CENTER FOR INTERNATIONAL ENVIRONMENTAL LAW, Plaintiff,**

v.

**OFFICE OF the UNITED STATES TRADE REPRESENTATIVE, et al., Defendants.**

**Civil Action No. 01–498.**

United States District Court, District of Columbia.

Feb. 29, 2012.

Anne L. Weismann, Citizens for Responsibility and Ethics in Washington, Daniel Schwei, Laurie J. Weinstein, U.S. Department of Justice, Washington, DC, for Defendant.

## *MEMORANDUM OPINION*

RICHARD W. ROBERTS, District Judge.

The Center for International Environmental Law ("CIEL") brought this action against the United States Trade Representative and his office (collectively "USTR"), seeking documents under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. The only document remaining at issue is "Document 1," a one-page position paper produced by the United States during negotiations to conclude a free-trade agreement with foreign nations. USTR has filed a second renewed motion for summary judgment, and CIEL has filed a cross-motion for summary judgment. Having been afforded three opportunities to justify withholding the document, USTR has not provided a plausible or logical explanation for why disclosure of the document would harm the United States' foreign relations. Accordingly, USTR's motion for summary judgment will be denied, CIEL's cross-motion will be granted, and USTR will be ordered to disclose Document 1.

## *BACKGROUND*

The background of this case is fully discussed in *Ctr. for Int'l Envtl. Law v. Office of U.S. Trade Representative* (*"CIEL I"*), 505 F.Supp.2d 150, 153–54 (D.D.C.2007), and *Ctr. for Int'l Envtl. Law v. Office of U.S. Trade Representative* (*"CIEL II"*), 777 F.Supp.2d 77, 80–81 (D.D.C.2011). As to facts relevant here,

J. Martin Wagner, Earthjustice, Oakland, CA, for Plaintiff.

CIEL seeks "Document 1," a position paper prepared by USTR during sessions of the Negotiating Group on Investment for the Free Trade Agreement of the Americas ("FTAA"). The purpose of the agreement was to create a free-trade area among thirty-four nations in the western hemisphere. The United States took part in FTAA negotiations during the 1990s and 2000s, but no agreement was reached. (Defs.' Stmt. of Material Facts Not in Dispute ("Defs.' Stmt.") ¶¶ 2–4.) Document 1 sets forth the United States' initial proposed position on the meaning of the phrase "in like circumstances." (Mem. of P. & A. in Supp. of Defs.' Second Renewed Mot. Summ. J. ("Defs.' Mem.") at 2.) This phrase "helps clarify when a country must treat foreign investors as favorably as local or other foreign investors—*i.e.*, when 'national' treatment or 'most-favored-nation' treatment applies." (*Id.*; Defs.' Suppl. Br. in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Suppl. Br."), Bliss Decl. ("First Bliss Decl.") ¶¶ 13–14.)

The nations participating in the FTAA negotiations agreed initially that any negotiating document produced or received in confidence during the negotiations would not be released to the public unless all nations agreed. (Defs.' Mem. at 2; Defs.' Suppl. Br., Lezny Decl. ¶ 5.) Later they "agreed that all FTAA documents would become derestricted and available for public release on December 31, 2013, unless a country were to object to the release of one of its own documents at that time." (Defs.' Mem. of P. & A. in Opp'n to Pl.'s Cross–Mot. Summ. J. and Reply Mem. in Supp. of Defs.' Second Renewed Mot.

Summ. J. ("Defs.' Opp'n"), Bliss Decl. ("Third Bliss Decl.") ¶ 5.) Subsequently, the then-Deputy United States Trade Representative extended the "Confidential" classification of all FTAA documents under USTR's control until December 31, 2013, "in order to be consistent with [the United States'] international obligation." (Defs.' Mem. at 1; Third Bliss Decl. ¶ 6.) USTR classified Document 1 based on the criteria of Executive Order 12958 (Defs.' Mem. at 1), which permits classification of information if, among other requirements that are uncontested here, "the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security . . . and . . . is able to identify or describe the damage." 60 Fed. Reg. 19826 § 1.2(a)(4) (revoked by Executive Order 13526, 75 Fed. Reg. 707, which uses identical classification criteria in this context).[1]

USTR has twice previously moved for summary judgment, arguing that disclosure of Document 1 would damage foreign relations by violating the confidentiality agreement among the FTAA nations and causing nations to adopt more rigid trade positions, resulting in less favorable trade terms for the United States. Both motions were denied on grounds that USTR had not sufficiently substantiated the asserted harms. Specifically, the most recent memorandum opinion noted that USTR had not shown it likely that disclosure of Document 1 would damage trust with other FTAA nations, because Document 1 is the United States' own material and its disclosure would not necessarily

---

1. In its cross-motion for summary judgment, CIEL argued that Document 1 ceased to be classified under the Executive Order in 2011, but it withdrew this argument (Pl.'s Reply in Support of Pl.'s Cross–Mot. Summ. J. at 2 n. 1) in light of the defendants' representation and supporting declaration that a USTR offi- cial with original classification authority extended the classification of Document 1 until December 31, 2013 (Defs.' Opp'n at 2; Third Bliss Decl. ¶¶ 5–7). The dispute, therefore, concerns whether the classification was proper under the criteria set forth in the Executive Order.

provide a basis for foreign officials to think that United States might dishonor its commitments to keep foreign information confidential. *CIEL II*, 777 F.Supp.2d at 84. In addition, the opinion noted the apparent inconsistency of USTR's argument on the one hand that breaching the confidentiality agreement would damage foreign officials' trust that the United States would honor its commitments, and its argument on the other hand that disclosing the document would harm national security by hindering the United States' flexibility to assert different meanings of "in like circumstances" in different contexts, a tactic that could undermine foreign governments' trust in the United States. *Id.* at 85. The opinion also found unconvincing USTR's argument that disclosure of the document would create the perception among foreign nations that the United States was attempting to entrench its own interpretation of the phrase at issue, noting that USTR would not be releasing the document by way of unilateral volition, but by way of court-ordered compliance with FOIA. *Id.*

USTR has again moved for summary judgment, clarifying and augmenting its previous arguments for withholding Document 1. USTR maintains that the United States at present is negotiating trade and investment agreements, some but not all of which involve the FTAA countries. (Defs.' Mem. at 11 (citing Second Bliss Decl. ¶ 5).) It argues that the loss of trust caused by releasing Document 1 would impede these on-going and future negotiations. *Id.* In addition, USTR elaborates why disclosure would decrease the United States' flexibility in on-going and future negotiations, positing that even if the United States might want Document 1's interpretation of "in like circumstances" to be accepted by foreign governments in other agreements, the United States might want to "negotiate up" to that position or to preserve its negotiating capital by accepting another country's proposal of that interpretation rather than expending effort to convince other governments to accept the United States' disclosed FTAA position. (Defs.' Mem. at 16 (citing Second Bliss Decl. ¶ 10).) USTR also reasserts its position that disclosing Document 1 would increase the risk of adverse arbitration decisions, should arbitrators be willing to look to the document for assistance in interpreting the term. (Defs.' Mem. at 13–14.) USTR contends that its desire to maintain the United States' flexibility to assert different interpretations of "in like circumstances" in different contexts is not inconsistent with its commitment to maintain foreign governments' trust by adhering to the confidentiality agreement. "Because the FTAA was never concluded, FTAA governments do not view Document 1 as binding the United States[,]" USTR argues, and "[t]hus, asserting an interpretation different from the one set forth in Document 1 would not be seen as a breach of trust." (Defs.' Mem. at 15.)

CIEL opposes USTR's motion and itself moves for summary judgment on the grounds that the defendants fail to substantiate their claims that foreign governments would lose trust in the United States in the event USTR is compelled to disclose its own negotiating document. (Pl.'s Mem. of P. & A. in Opp'n to Defs.' Second Renewed Mot. Summ. J. and in Support of Pl.'s Cross–Mot. Summ. J. ("Pl.'s Mem.") at 13–19.) In addition, CIEL argues that USTR has not demonstrated that reduced negotiation flexibility would cause the requisite harm to national security. (*Id.* at 20–23.) CIEL maintains that USTR's previous disclosure of three related documents undermines the defendants' arguments for withholding Document 1. (*Id.* at 19–21.) Finally, CIEL contends that USTR's arguments regarding the harm from reduced flexibility con-

tinue to be inconsistent with the argument that adhering to the confidentiality agreement is necessary to maintain the trust of foreign negotiating partners. (*Id.* at 23–25.)

## DISCUSSION

■■■ In a FOIA suit, the agency resisting disclosure bears the burden of persuasion in defending its action. 5 U.S.C. § 552(a)(4)(B); *see also Akin, Gump, Strauss, Hauer & Feld, LLP v. U.S. Dep't of Justice,* 503 F.Supp.2d 373, 378 (D.D.C. 2007). An agency is entitled to summary judgment if it demonstrates that no material facts are in dispute and that the requested material is exempt from disclosure. *Students Against Genocide v. Dep't of State,* 257 F.3d 828, 833 (D.C.Cir.2001). In order to provide an effective opportunity for the requesting party to challenge the applicability of an exemption and for the court to assess the exemption's validity, "[t]he description and explanation the agency offers should reveal as much detail as possible as to the nature of the document, without actually disclosing information that deserves protection." *Oglesby v. U.S. Dep't of Army,* 79 F.3d 1172, 1176 (D.C.Cir.1996). Where an agency fails to meet its burden to justify application of a FOIA exemption, a court may order disclosure. *Coastal States Gas Corp. v. Dep't of Energy,* 617 F.2d 854, 870 (D.C.Cir.1980).

■■■ USTR relies on FOIA Exemption 1 to oppose CIEL's request. Exemption 1 protects from disclosure matters that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order[.]" 5 U.S.C. § 552(b)(1). For an agency to justify withholding material under Exemption 1, it must by affidavit:

(1) identify the document, by type and location in the body of documents requested; (2) note that Exemption 1 is claimed; (3) describe the document withheld or any redacted portion thereof, disclosing as much information as possible without thwarting the exemption's purpose; (4) explain how this material falls within one or more of the categories of classified information authorized by the governing executive order; and (5) explain how disclosure of the material in question would cause the requisite degree of harm to the national security.

*King v. U.S. Dep't of Justice,* 830 F.2d 210, 224 (D.C.Cir.1987). Courts should accord agency affidavits expressing national security concerns substantial weight and take account of the fact that harm to national security cannot be predicted with precision but rather will always be somewhat speculative in nature. *Wolf v. CIA,* 473 F.3d 370, 374 (D.C.Cir.2007). Nonetheless, affidavits that contain categorical or conclusory statements, or which are contradicted by other evidence in the record, will not pass muster. *PHE, Inc. v. Dep't of Justice,* 983 F.2d 248, 250 (D.C.Cir.1993); *Halperin v. CIA,* 629 F.2d 144, 148 (D.C.Cir.1980). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.' " *ACLU v. U.S. Dep't of Def.,* 628 F.3d 612, 619 (D.C.Cir.2011) (quoting *Larson v. Dep't of State,* 565 F.3d 857, 862 (D.C.Cir.2009) (internal quotations omitted)).

The Executive Order under which USTR classified Document 1 articulates the "degree of harm" required by providing that the "Confidential" designation shall be applied where unauthorized disclosure of the classified information "reasonably could be expected to cause damage to the national security that the original clas-

sification authority is able to identify or describe." E.O. 12958 1.2(a)(3) (as amended by E.O. 13292, 68 Fed. Reg. 15315 (Mar. 25, 2003)). " 'Damage to the national security' means harm to the national defense or foreign relations of the United States from the unauthorized disclosure of information, taking into consideration such aspects of the information as the sensitivity, value, utility, and provenance of that information." *Id.* § 6.1(j). USTR asserts that the document is properly classified because "USTR determined that the unilateral release of Document 1 'reasonably could be expected to cause damage' to the United States' foreign relations." (Defs.' Mem. at 1) (quoting Executive Order 12958 § 1.2(a)(3)). However, USTR's various arguments do not present a logical or plausible explanation for its determination, and the record does not support a reasonable anticipation of harm from disclosure.

The April 12, 2011 opinion noted that while the prospect of revealing foreign government information typically supports withholding disclosure under Exemption 1, the claim that a breach of the FTAA confidentiality agreement would harm national security is less compelling here since the United States would be revealing its own position only. USTR maintains that because the confidentiality agreement covered *all* of the material exchanged during negotiations, the loss of trust is the same. There is, however, a meaningful difference between the United States' disclosure of information that it receives in confidence from a foreign government, with the foreign government's understanding that the information will be kept secret, and the United States' disclosure of a document that it itself created and provided to others. While a breach of the confidentiality agreement will occur in either case, the resulting affect on the United States' foreign relations—the key factor for assessing whether the document is properly

classified—is not identical. In *Brayton v. Office of U.S. Trade Representative,* 657 F.Supp.2d 138 (D.D.C.2009), the court's determination that USTR was legally entitled to withhold a document covered by a confidentiality agreement did not hinge on the mere existence of the agreement, but depended on the circumstances of the specific disclosure in that case. In particular, the court took account of the fact that the negotiations to which the requested document related were ongoing and disclosure would have revealed the current and sensitive negotiating positions of both the United States and the European Union. *Id.* at 145; *see also Ctr. for Int'l Envtl. Law v. U.S. Trade Representative,* 237 F.Supp.2d 17, 32 (D.D.C.2002) (finding that defendants had properly invoked Exemption 1 where the defendants' declarant articulated the particularly sensitive and controversial topic of the requested documents, the disclosure of which would reveal high-level internal government deliberations and interagency disagreements).

By contrast, USTR's arguments regarding loss of trust are at a high level of generality, asserting that the confidentiality agreement facilitates the "give-and-take of negotiations" (Second Bliss Decl. ¶ 5) without articulating particular reasons why its foreign negotiating partners would have any continued interest in maintaining the secrecy of the United States' own initial position on the phrase "in like circumstances." The harm resulting from breach of the confidentiality agreement here, and the asserted need to insulate negotiations from potential opposition from participating nations' "vested local economic interests" in order to provide "room to negotiate" and make it less likely that foreign partners will "adopt and maintain rigid negotiating positions unfavorable to U.S. economic and security interests" (First Bliss Decl. ¶ 10), is substantially mitigated

because the FTAA negotiations are not ongoing. The defendants' failure to assert any particular present sensitivities implicated by Document 1 leaves the breach of the confidentiality agreement as the sole basis for inferring a loss of trust. A per se rule that existence of a confidentiality agreement provides an adequate basis for proper classification of a covered document is flatly incompatible with FOIA's commitment to subject government activity to the "the critical lens of public scrutiny." *Alliance for the Wild Rockies v. Dep't of the Interior*, 53 F.Supp.2d 32, 35 (D.D.C.1999). Although a court need not "agree in full with the defendants' evaluation of the danger," USTR's judgment must pass the "test of reasonableness, good faith, specificity and plausibility." *Am.-Arab Anti–Discrimination Comm. v. DHS*, 516 F.Supp.2d 83, 89 (D.D.C.2007) (internal quotations omitted). USTR's arguments that a loss of trust amounting to damage to foreign relations would occur upon disclosure here do not pass this test.

The standing agreement is that the nations will "not release to the public any negotiating documents that they exchanged in the course of the negotiations, other than on the specific request of a participating government and in the absence of any objection from another such government." (Second Bliss Decl. ¶ 4.) The agreement therefore permits the United States to request disclosure of a document and to disclose it if it receives no objection. With regard to Document 1, the record lacks any indication that the United States' FTAA partners would oppose disclosure. To be sure, the prior proceedings in this litigation have not imposed on the USTR any obligation to request disclosure, and, as is discussed above, USTR's argument is that *unilateral* disclosure compelled by this action would itself constitute harm to foreign relations. However, because breach of a confidential-

ity agreement does not suffice to establish harm where the breach is caused by release of the United States' own information, reasons for predicting a loss of foreign governments' trust must be tied, but are not tied here, to the specific content of the document at issue. Moreover, the FTAA nations' agreement that all documents will be "derestricted and available for public release on December 31, 2013, *unless a country were to object to the release of one of its own documents at that time*" (Third Bliss Decl. ¶ 5) supports CIEL's argument that the primary interest protected by confidentiality is a country's ability to determine the release of its own materials, not to keep others from releasing theirs. (Pl.'s Reply at 7.)

Aside from the arguments premised on breach of the confidentiality agreement, USTR's additional arguments for withholding Document 1 do not present logical or plausible reasons why disclosure would cause harm to United States' foreign relations. First, although USTR's renewed motion attempts to resolve the apparent inconsistency, identified in the April 12, 2011 opinion, between USTR's expressed desire both to maintain the trust of foreign governments by adhering to the confidentiality agreement and to maintain its own flexibility to assert a different interpretation of "in like circumstances" in different contexts, its resolution of that issue undercuts its argument that reduced flexibility will harm foreign relations. Specifically, USTR's declarant clarifies that, since the FTAA has not been concluded and the position expressed in Document 1 is not considered binding by the FTAA nations, those governments would not view it as a breach of trust if the United States advanced a different interpretation of "in like circumstances" in arbitral proceedings or in future negotiations. (Defs.' Mem. at 15–16 (citing Second Bliss Decl. ¶¶ 9–10).)

The declarant emphasized, based on her "experience as a trade negotiator," that "[t]rade negotiating partners will commonly remind each other that 'nothing is agreed until everything is agreed,' which means that a party is free to revise its positions at any point until a final agreement is reached." (Second Bliss Decl. ¶ 11.)

Accepting USTR's logic on this point, and assuming that the FTAA nations will not find the United States' shifting positions on the term untrustworthy, the grounds for predicting that disclosure of Document 1 would reduce significantly the United States' flexibility in the future are tenuous. If, as defendants maintain, trade negotiators understand that an initial position like Document 1 is a non-binding starting point, and that, accordingly, the United States may revise or withdraw it at any time, it is unclear why disclosure of the document "reasonably could be expected to cause damage" to the United States' foreign relations by *reducing future flexibility*. (Defs.' Mem. at 1.) FTAA negotiations extended over the 1990s and 2000s, across multiple United States administrations. (Defs.' Stmt. ¶ 2.) Defendants have presented no "logical or plausible" reason, *ACLU*, 628 F.3d at 619 (internal quotations omitted), why future negotiating partners would have so firm an expectation that the current or future United States administration would or should adhere to the same interpretation of "in like circumstances" presented in the FTAA context such that the United States will be impeded in presenting a different interpretation.

For the same reason, USTR's argument that withholding Document 1 is necessary to preserve its negotiating capital is unpersuasive. According to the declarant, "[e]ven if the Untied States was prepared to embrace in a future agreement an interpretation of 'in like circumstances' identical to that reflected in Document 1, U.S. negotiators might not want that interpretation to be included in the opening U.S. position," but rather they "might want to start with a different offer, and then 'negotiate up' to the positions taken in Document 1" or they might want to accept a substantially similar proposal from a trading partner. (Second Bliss Decl. ¶ 10.) Neither of these options, however, would be foreclosed by the disclosure of Document 1. Because the interpretive position explained in that document is not binding and, according to USTR's declarant, "the United States does not risk eroding the trust of its negotiating partners simply by altering the positions it advances during trade negotiations" (Second Bliss Decl. ¶ 11), the United States' ability not to open with Document 1's interpretation in the future, or to accept it from a negotiating partner, is not realistically imperilled by disclosure. Similarly, USTR's argument that disclosure of Document 1 could increase the United States' exposure to adverse arbitration decisions is insufficiently substantiated. The FTAA was never concluded and arbitrators, like trade negotiators, are generally aware of the non-binding, preliminary nature of the interpretive position articulated in Document 1. The case law on which USTR relies for this proposition concerned instances where material relating to *concluded*, albeit possibly unenforceable, treaties were consulted for interpretative assistance. (Defs.' Opp'n at 9.) Document 1, as the declarant herself emphasizes (Second Bliss Decl. ¶ 7), was expressly a *preliminary* position, and the risk that international arbitrators will adopt the position, much less rely on it to the United States' detriment in arbitration, is too speculative to justify a reasonable

expectation of harm to foreign relations.[2]

### CONCLUSION

The present round of briefing afforded USTR a third opportunity to meet its burden to justify application of Exemption 1. USTR, however, fails to provide a plausible or logical explanation of why disclosure of Document 1 reasonably could be expected to damage United States' foreign relations. USTR's motion for summary judgment therefore will be denied, CIEL's cross-motion will be granted, and USTR will be enjoined from withholding Document 1. An appropriate order accompanies this memorandum opinion.

2. CIEL argues that USTR's release of other, related documents in the course of this litigation undermines USTR's argument for withholding Document 1. (Pl.'s Reply at 2.) The D.C. Circuit has "repeatedly rejected the argument that the government's decision to disclose some information prevents the government from withholding other information about the same subject." *ACLU*, 628 F.3d at 625. The present opinion bases the decision to grant summary judgment to the plaintiff on the defendants' failure to articulate logical or plausible reasons to withhold Document 1, and does not rely on the defendants' previous disclosure of Documents 8, 38, and 43.