# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 21, 2013        Decided June 7, 2013

No. 12-5136

CENTER FOR INTERNATIONAL ENVIRONMENTAL LAW,
APPELLEE

v.

OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE AND
RON KIRK, IN HIS OFFICIAL CAPACITY AS THE UNITED STATES
TRADE REPRESENTATIVE,
APPELLANTS

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:01-cv-00498)

———

*H. Thomas Byron III*, Attorney, U.S. Department of Justice, argued the cause for appellants. With him on the briefs were *Stuart F. Delery*, Principal Deputy Assistant Attorney General, *Ronald C. Machen*, U.S. Attorney, and *Matthew M. Collette*, Attorney. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

*J. Martin Wagner* argued the cause and filed the brief for appellee. *Sarah H. Burt* entered an appearance.

*Bruce D. Brown* was on the brief for *amici curiae* The Reporters Committee for Freedom of the Press, et al. in support

of appellee. *Laurie A. Babinski*, *Jonathan D. Hart*, *Kathleen A. Kirby*, *Eric N. Lieberman*, *David E. McCraw*, *Bruce W. Sanford*, *Peter E. Scheer*, and *Kurt A. Wimmer* entered appearances.

Before: BROWN and KAVANAUGH, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* RANDOLPH.

RANDOLPH, *Senior Circuit Judge*:

The nature of foreign negotiations requires caution, and their success must often depend on secrecy; and even when brought to a conclusion, a full disclosure of all the measures, demands, or eventual concessions, which may have been proposed or contemplated, would be extremely impolitic: for this might have a pernicious influence on future negotiations, or produce immediate inconveniences; perhaps danger and mischief, in relation to other Powers.

So wrote President George Washington in response to a request of the House of Representatives that he "lay before [the] House a copy of the instructions to the minister of the United States who negotiated the treaty with the King of Great Britain"—the Jay Treaty—"together with the correspondence and other documents relative to that treaty." George Washington, Message to the House of Representatives (Mar. 30, 1796), *in* 1 AMERICAN STATE PAPERS: FOREIGN RELATIONS 550, 550–51 (Walter Lowrie & Matthew St. Clair Clarke eds., 1833).[1] President

---

[1] President Washington added that "all the papers affecting the negotiation with Great Britain were laid before the Senate, when the

Washington's objections have a direct bearing on this appeal from the district court's order requiring the Office of the United States Trade Representative to disclose a classified document describing the government's position during international trade negotiations.

During the 1990s and early 2000s, the United States and thirty-three other countries participated in negotiations seeking to establish the Free Trade Agreement of the Americas, a proposed agreement that would have governed international trade and investment throughout the Western Hemisphere. In July 2000, the Center for International Environmental Law, a not-for-profit public-interest organization, submitted a Freedom of Information Act, 5 U.S.C. § 552, request to the Office of the United States Trade Representative. The Center sought, among other things, documents circulated or tabled by the United States during sessions of the Free Trade Agreement of the Americas Negotiating Group on Investment held in February and May 2000. The Trade Representative identified forty-six documents responsive to the Center's request but withheld the documents as exempt from disclosure. The Center sued to compel production.

After years of litigation, only one document remains in dispute—a white paper referred to in the district court proceedings as "document 1."[2] The white paper consists of the

---

treaty itself was communicated for their consideration and advice." *Id.* at 551.

[2] A complete history of the litigation may be found in the district court's three opinions. *See Ctr. for Int'l Envtl. Law v. Office of the U.S. Trade Representative*, 845 F. Supp. 2d 252 (D.D.C. 2012); *Ctr. for Int'l Envtl. Law v. Office of the U.S. Trade Representative*, 777 F. Supp. 2d 77 (D.D.C. 2011); *Ctr. for Int'l Envtl. Law v. Office of the*

Trade Representative's commentary on the interpretation of the phrase "in like circumstances." The government shared the paper with the Negotiating Group on Investment.

The United States and the thirty-three other countries participating in the Free Trade Agreement of the Americas negotiations agreed that all negotiating documents produced or received during the course of negotiations would be restricted and would not be released to the public if any participating government objected to disclosure. Citing this confidentiality agreement as well as the harm to "relations with foreign governments and foreign activities" that it believed would result from disclosure, the Trade Representative classified the white paper as "confidential" and invoked FOIA exemption 1, which applies to classified materials, as the basis for withholding it.[3]

Exemption 1 protects from disclosure information that has been "properly classified" in the interest of "national defense or foreign policy." 5 U.S.C. § 552(b)(1).[4] The governing Executive Order provides that information is properly classified as

*U.S. Trade Representative*, 505 F. Supp. 2d 150 (D.D.C. 2007).

[3] In 2008, faced with the likely end of negotiations, the thirty-four participating governments agreed that all negotiating documents would be "derestricted" and available for public release on December 31, 2013, unless the government that produced a particular document objected to its disclosure. In its brief, the Trade Representative asserts that it intends to notify the other negotiating governments that the white paper should remain restricted after December 31, 2013.

[4] Under exemption 1, the disclosure requirements of FOIA do not apply to matters that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1).

"confidential" if its disclosure "reasonably could be expected to cause damage to the national security," Exec. Order No. 12,958, *as amended by* Exec. Order 13,292, § 1.2(a)(3), 68 Fed. Reg. 15,315, 15,316 (Mar. 28, 2003), which includes "harm to the . . . foreign relations of the United States," *id.* § 6.1(j), 68 Fed. Reg. at 15,331.[5]

The Trade Representative tells us that the phrase "in like circumstances," the meaning of which the white paper discusses, is a key element of two nondiscrimination provisions integral to trade and investment agreements entered into by the United States—the "most-favored-nation treatment" and the "national treatment" provisions.[6] The phrase defines the conditions under

---

[5] The Center and the Trade Representative agree that Executive Order 12,958, which was in effect when the Trade Representative's classification decision was made, governs. We cite the amended version of that Executive Order (found in Executive Order 13,292) because, although the Trade Representative originally classified the document on May 10, 2001, before this amendment was made, on September 18, 2008, after the amendment took effect, the Trade Representative extended the duration of the classification. Executive Order 12,958 was later superseded by Executive Order 13,526, which took effect during the course of the district court proceedings. *See* Exec. Order No. 13,526, §§ 6.2(g), 6.3, 75 Fed. Reg. 707, 731 (Jan. 5, 2010). We need not concern ourselves with the question of which Executive Order governs, *see Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 29–30 (D.C. Cir. 1998), since the relevant classification criteria are the same in both orders.

[6] National treatment requires that each party to the agreement "accord to investors of the other [p]arty treatment no less favorable than that it accords, in like circumstances, to its own investors with respect to the establishment, acquisition, expansion, management, conduct, operation, and sale or other disposition of investments in its territory." Trade Promotion Agreement, U.S.-Panama, art. 10.3, June 28, 2007 (entered into force Oct. 31, 2012), *available at*

which those provisions apply but is not itself defined in such agreements. The Trade Representative submitted declarations in the district court asserting that the "United States has routinely avoided making public U.S. interpretations of this type concerning 'in like circumstances'" because of the "wide variety of factual circumstances that could characterize investment relationships." The white paper, the Trade Representative declared, was not offered as a "definitive or exhaustive statement of U.S. views on how the concept [of 'in like circumstances'] should be applied outside of the [Free Trade Agreement of the Americas] or to every situation," and its disclosure would limit the United States' flexibility to "assert a broader or narrower view of the meaning and applicability" of the phrase in interpreting existing agreements and in negotiating future agreements.

As an example, the Trade Representative pointed to "a substantial risk" that foreign investors or foreign governments

---

http://www.ustr.gov/trade-agreements/free-trade-agreements/panama-tpa/final-text. Most-favored-nation treatment requires that each party "accord to investors of the other [p]arty treatment no less favorable than that it accords, in like circumstances, to investors of any non-[p]arty with respect to the establishment, acquisition, expansion, management, conduct, operation, and sale or other disposition of investments in its territory." *Id.* art. 10.4. These two nondiscrimination provisions, including the phrase "in like circumstances," are present in the investment chapters of many other free-trade agreements, *see, e.g.*, North American Free Trade Agreement, art. 1102, 1103, Dec. 17, 1992, 32 I.L.M. 605 (entered into force Jan. 1, 1994), as well as in bilateral investment treaties, *see, e.g.*, Treaty Concerning the Encouragement and Reciprocal Protection of Investment, U.S.-Uruguay, art. 3, 4, Nov. 4, 2005, S. TREATY DOC. NO. 109-9 (entered into force Nov. 1, 2006). The Trade Representative advises us that the United States will seek to include these provisions (using the same language) in future agreements as well.

could use the interpretation set forth in the white paper to support a claim that the United States had breached its obligations under an existing investment agreement. "Specifically, foreign investors could question any interpretation of 'in like circumstances' that the United States offers that does not fall within the strict confines of [the white paper]." Although recognizing that the document is not binding on the United States, the Trade Representative expressed concern that "international arbitrators may nonetheless be willing to look at [the document] for assistance in interpreting the phrase 'in like circumstances' since the term is not specifically defined in trade agreements." That, the Trade Representative asserted, could make it more difficult for the United States to defend its interests.

The district court concluded that this risk of adverse arbitration decisions was "insufficiently substantiated." *Ctr. for Int'l Envtl. Law*, 845 F. Supp. 2d at 259. Arbitrators, the court reasoned, "are generally aware of the non-binding, preliminary nature of the interpretive position articulated in [the disputed document]," and "the risk that international arbitrators will adopt the position, much less rely on it to the United States' detriment in arbitration, is too speculative to justify a reasonable expectation of harm to foreign relations." *Id.* at 259–60.

We do not see why, in the absence of a definition in the governing agreement, it is so implausible that an arbitrator would look to the white paper as evidence of the United States' interpretation of the phrase—even if that document is not binding on the United States.

With respect to negotiating future agreements, the Trade Representative asserted that "[e]ven if the United States was prepared to embrace in a future agreement an interpretation of 'in like circumstances' identical to that reflected in [the white

paper], U.S. negotiators might not want that interpretation to be included in the opening U.S. position." Rather, the Trade Representative explained, "[t]hey might want to start with a different offer, and then 'negotiate up' to the positions taken in [the white paper]." Alternatively, the Trade Representative explained, a negotiating partner "might first propose an interpretation of 'in like circumstances' that is substantially similar to the one reflected in [the white paper]," and "U.S. negotiators might wish to accept 'their' proposal rather than having to expend our own negotiating capital to convince the other government(s) to accept 'ours.'" Publicly disclosing the white paper, the Trade Representative declared, "would prevent the U.S. negotiators from exercising either of these techniques—both of which are very common, and very useful, in conducting trade negotiations"—and would thereby "damage [the] ability of the United States to conclude future trade agreements on favorable terms."

The district court rejected the Trade Representative's argument and concluded that "[n]either of these options . . . would be foreclosed by the disclosure of [the white paper]." *Ctr. for Int'l Envtl. Law*, 845 F. Supp. 2d at 259. The Trade Representative had explained that the position taken in the white paper is not binding, and further that the United States does not risk eroding the trust of its negotiating partners by altering its positions during negotiations. From this the district court reasoned that "the United States' ability not to open with [the white paper's] interpretation in the future, or to accept it from a negotiating partner, is not realistically imperilled by disclosure." *Id.*

We see no basis for doubting that the effectiveness of these negotiating strategies could very well be limited if a negotiating partner were aware of the positions the United States has taken in the past. It is important to keep in mind that the Trade

Representative was expressing concerns about the United States' flexibility in future negotiations not necessarily with the governments that participated in the Free Trade Agreement of the Americas negotiations, but with governments that did *not* take part in those negotiations. Absent disclosure of the white paper, these other governments would not know the position the United States had taken in the earlier negotiations.

Apparently recognizing as much, the district court mentioned that the negotiations here extended across multiple administrations. The court's point was that future negotiating partners would not have any "firm" expectation that a new U.S. administration would adhere to the interpretation of "in like circumstances" an earlier administration had advanced. *Id.* This may be true, or it may not be. We do not know the expectations of foreign governments or the positions future U.S. administrations will support. But we do know that disclosure of the white paper would reveal a position taken by the United States in the past. It seems perfectly reasonable to think that could limit the flexibility of U.S. negotiators.

Whether—or to what extent—this reduced flexibility might affect the ability of the United States to negotiate future trade agreements is not for us to speculate. The government has determined that it would "damage [the] ability of the United States to conclude future trade agreements on favorable terms." That determination has the force of history behind it. It echoes what George Washington wrote more than two centuries ago. Courts are "in an extremely poor position to second-guess" the Trade Representative's predictive judgment in these matters, *Larson v. Dep't of State*, 565 F.3d 857, 865 (D.C. Cir. 2009) (internal quotation marks omitted), but that is just what the district court did in rejecting the agency's justification for withholding the white paper.

The question is not whether the court agrees in full with the Trade Representative's evaluation of the expected harm to foreign relations. *See Gardels v. CIA*, 689 F.2d 1100, 1105 (D.C. Cir. 1982). Rather, the question is "whether on the whole record the [a]gency's judgment objectively survives the test of reasonableness, good faith, specificity, and plausibility." *Id.* We conclude that it does.

The Center suggests that the Trade Representative has not shown the "requisite degree of harm," Appellee's Br. 40 (quoting *King v. U.S. Dep't of Justice*, 830 F.2d 210, 224 (D.C. Cir. 1987)), asserting that the agency "has presented *no* evidence that the harm from the disclosure of the content of [the white paper] would interfere with [the Trade Representative's] responsibilities enough to outweigh FOIA's policy of 'full agency disclosure,'" *id.* at 48 (quoting *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 16 (2001)). But there is no such balancing test under exemption 1. The only question is whether the disputed document is properly classified under the applicable Executive Order. *See* 5 U.S.C. § 552(b)(1). Here, the question is whether the white paper is properly classified as "confidential." The governing Executive Order does not require the identification of any specific degree of harm to support classification at the "confidential" level. *See* Exec. Order No. 12,958, *as amended by* Exec. Order 13,292, § 1.2(a)(3), 68 Fed. Reg. at 15,316. While classification at the "top secret" or "secret" levels requires that disclosure "reasonably could be expected to cause exceptionally grave damage" or "serious damage," as the case may be, to the national security, classification at the "confidential" level requires only that disclosure "reasonably could be expected to cause damage to the national security." *Id.* at § 1.2(a), 68 Fed. Reg. at 15,315–16. As discussed above, the Trade Representative has satisfied its burden to explain the damage

that reasonably could be expected to result from disclosure of the white paper.

Because the white paper was properly classified as confidential, the Trade Representative properly withheld the document as exempt from disclosure under FOIA exemption 1. Accordingly, the judgment of the district court is

*Reversed.*