Main Street Legal Services v. National Security

# In the
# United States Court of Appeals
## For the Second Circuit

---

August Term, 2014

(Argued: March 2, 2015     Decided: January 26, 2016)

Docket No. 13-3792-cv

---

MAIN STREET LEGAL SERVICES, INC.,

*Plaintiff-Appellant,*

—v.—

NATIONAL SECURITY COUNCIL,

*Defendant-Appellee.*

---

Before:

RAGGI, WESLEY, AND LYNCH, *Circuit Judges.*

---

On appeal from a judgment entered in the Eastern District of New York

(Vitaliano, *J.*) dismissing plaintiff's complaint for failure to state a claim under

the Freedom of Information Act ("FOIA"), plaintiff challenges the district court's

1

holding that the National Security Council is not an "agency" subject to the

FOIA. 5 U.S.C. §§ 551(1), 552(f)(1).

AFFIRMED.

Judge WESLEY concurs in a separate opinion.

---

RAMZI KASSEM, Main Street Legal Services, Inc. (Douglas Cox, City University of New York School of Law, *on the brief*), Long Island City, New York, *for Plaintiff-Appellant*.

JAYNIE RANDALL LILLEY, Attorney (Stuart F. Delery, Assistant Attorney General, Mark B. Stern, Attorney, *on the brief*), Civil Division, United States Department of Justice, Washington, D.C., *for* Robert L. Capers, United States Attorney for the Eastern District of New York, Brooklyn, New York, *for Defendant-Appellee*.

---

REENA RAGGI, *Circuit Judge*:

This appeal requires us to decide whether the National Security Council

("NSC") is an "agency" subject to the retention and disclosure requirements of

the Freedom of Information Act ("FOIA"), Pub. L. No. 89-487, 80 Stat. 250 (1966)

(codified as amended at 5 U.S.C. § 552). The United States District Court for the

Eastern District of New York (Eric N. Vitaliano, *Judge*) concluded that it was not

and, on August 7, 2013, entered judgment dismissing this FOIA action to compel

the production of certain NSC minutes and records, particularly those related to

targeted drone strikes. See Main St. Legal Servs. v. Nat'l Sec. Council, 962 F. Supp. 2d 472 (E.D.N.Y. 2013).

On de novo review, see Phillips v. City of New York, 775 F.3d 538, 542 (2d Cir. 2015), we construe the "agency" provision of the FOIA, 5 U.S.C. §§ 551(1), 552(f)(1), the "function" provisions of the NSC's statute, 50 U.S.C. § 3021(a), and the current presidential directive organizing the National Security Council System ("NSC System"), see Barack Obama, Presidential Policy Directive-1 ("PPD-1"), at 1 (2009), available at https://www.hsdl.org/?view&did=34560, among other available legal sources, and we conclude that the NSC is not an agency subject to the FOIA. Because we further construe the FOIA's agency requirement to relate to the court's remedial power rather than to its subject-matter jurisdiction, we conclude that the district court properly granted dismissal for failure to state a claim, see Fed. R. Civ. P. 12(b)(6), rather than for lack of jurisdiction, see Fed. R. Civ. P. 12(b)(1). Finally, we conclude that the district court acted within its discretion in granting dismissal without discovery. We, therefore, affirm the challenged judgment.

## I.    Background

### A.    The FOIA's Disclosure Requirement

The FOIA, which took effect in July 1967, establishes record retention and disclosure requirements for federal agencies.  See 5 U.S.C. § 552.  Of particular relevance here is the requirement that agencies "promptly [make] available to any person," upon request, such reasonably described records as are not already publicly available and not subject to specific exemptions.  Id. § 552(a)(3)(A); see id. § 552(b) (identifying exemptions).  A person who thinks that an agency has improperly withheld records subject to FOIA disclosure may seek an order of production from a district court, which will review the matter de novo, placing the burden on the agency to defend its non-disclosure decisions.  See id. § 552(a)(4)(B).  Where, as here, there is a dispute as to whether the requested entity is an agency, the burden on that preliminary legal question rests with the party seeking production.  See Armstrong v. Exec. Office of the President, 90 F.3d 553, 565 (D.C. Cir. 1996).[1]

---

[1] Plaintiff has acknowledged that "many, if not all," of the records it demands from the NSC may be subject to a FOIA disclosure exemption.  Appellant's Br. 53; see, e.g., 5 U.S.C. § 552(b)(1) (exemption for classified records); id. § 552(b)(5) (exemption for records of deliberative process); see also Douglas Cox & Ramzi Kassem, Off the Record: The National Security Council, Drone Killings, and Historical Accountability, 31 Yale J. on Reg. 363, 391 (2014).  The task of deciding

B.    The National Security Council

In the National Security Act of 1947, Pub. L. No. 80-253, § 101, 61 Stat. 495, 496–97 (codified as amended at 50 U.S.C. § 3021), Congress created a National Security Council ("Council") and assigned it "[t]he function . . . to advise the President with respect to the integration of domestic, foreign, and military policies relating to the national security so as to enable the military services and the other departments and agencies of the Government to cooperate more effectively in matters involving the national security," 50 U.S.C. § 3021(a).[2]  The statute denominates the President as the presiding officer of the Council, on which serve certain statutorily identified officials, including the Vice President

which documents are subject to exemption would arise, however, only if the NSC is an agency subject to the FOIA.  That issue is the sole focus of this appeal.

[2] The National Security Act, together with its 1949 amendments, (1) "created the Department of Defense and brought together under it the Army, Navy, and Air Force"; (2) "created a Central Intelligence Agency for the collation and appraisal, at one central point, of world intelligence relating to our national security"; (3) "created the National Security Resources Board . . . to advise the President concerning the coordination of military, industrial, and civilian mobilization"; and (4) "established the National Security Council," all in order to facilitate "integration of national security policy at the highest level."  Dillon Anderson [National Security Advisor to President Dwight D. Eisenhower], The President and National Security, Atl. Monthly, Jan. 1956 (internal quotation marks omitted), reprinted in 2 Subcomm. on Nat'l Policy Mach. to the S. Comm. on Gov't Operations, 87th Cong., Organizing for National Security ("Organizing for Nat'l Sec.") 159, 161 (Comm. Print 1961).

and the Secretaries of State, Defense, and Energy, as well as other persons appointed by the President.  See id.[3]

### C.      Main Street's FOIA Request to the NSC

On November 27, 2012, plaintiff Main Street Legal Services, Inc.  ("Main Street"), "a non-profit law firm within the City University of New York School of Law," Compl. ¶ 4, submitted a FOIA request to the NSC seeking production of (1) "[a]ll records related to the killing and attempted killing by drone strike of U.S. citizens and foreign nationals," and (2) "[a]ll National Security Council meeting minutes taken in the year 2011," J.A. 25.[4]  The NSC denied the request

_____

[3] Additional members of the Council designated by President Obama are the Secretaries of the Treasury and Homeland Security, the Attorney General, the U.S. Representative to the United Nations, the President's Chief of Staff, and the President's National Security Advisor.  See PPD-1, at 2.  The President has directed that the following persons attend some or all NSC meetings: the Director of National Intelligence, the Chairman of the Joint Chiefs of Staff, the Counsel to the President, the President's Deputy National Security Advisor, the Secretary of Commerce, the U.S. Trade Representative, the President's Assistant for Economic Policy, the Chair of the Council of Economic Advisers, the President's Homeland Security Advisor, and the Director of the Office of Science and Technology Policy.  See id.

[4] The term "National Security Council" is used to describe both the statutorily created "Council" presided over by the President and the "NSC System," a hierarchy of interdependent committees and staff atop which the Council sits. See Armstrong v. Exec. Office of the President, 90 F.3d at 560 (describing NSC as "elaborate, self-contained structure and bureaucracy" organized into "complex system of committees and working groups"); David J. Rothkopf, Running the

by letter dated December 14, 2012, stating that "[a]s an organization in the Executive Office of the President that advises and assists the President, the National Security Council is not subject to the Freedom of Information Act." Id. at 29.

Main Street disagreed and, on February 21, 2013, it commenced this FOIA action in the Eastern District of New York, invoking 5 U.S.C. § 552(a)(4)(B) to seek a judicial order compelling the NSC to produce the requested records. The

---

World: The Inside Story of the National Security Council and the Architects of American Power, at XIV (2005) (describing common confusion over meaning of term "National Security Council"). Thus, while Main Street's FOIA request to the NSC for "National Security Council meeting minutes," J.A. 25, might be understood to be directed only to the Council, its broader request for "[a]ll records" related to drone strikes, including "[p]rocedures, mechanisms, or processes," or "[r]esults of investigations," id., appears directed to the entire NSC System because, as this opinion explains, such materials are exactly what the hierarchy of NSC committees and staff is expected to produce for the Council. Thus, because (1) "NSC" is routinely used to reference the entire NSC System (in much the same way "SEC" is used to reference an entity larger than its five-member Commission); (2) the FOIA requires only that a requestor "reasonably describe" the records sought, 5 U.S.C. § 552(a)(3)(A); and (3) the government has never suggested that it understood Main Street's FOIA request not to pertain to the NSC System, on this appeal, we construe Main Street's FOIA request and its agency argument to pertain to the NSC as a whole, i.e., both to the Council and to the NSC System. We therefore refer in this opinion to the "Council" as the statutorily created committee over which the President presides, the "NSC System" as the support staff and subcommittees that operate beneath the Council, and the "NSC" as the entirety, encompassing both the Council and the NSC System.

NSC moved to dismiss the complaint both for failure to state a claim upon which relief could be granted and for lack of subject-matter jurisdiction, arguing that it was not an "agency" subject to the FOIA. 5 U.S.C. §§ 551(1), 552(f)(1); see Fed. R. Civ. P. 12(b)(1), (b)(6).

The district court agreed that the NSC was not an agency and dismissed the case on the merits. On August 7, 2013, it entered the judgment in favor of the NSC from which Main Street now appeals. See Main St. Legal Servs. v. Nat'l Sec. Council, 962 F. Supp. 2d at 478–79.

## II. Discussion

### A. The FOIA Definition of "Agency"

As the parties acknowledge, the FOIA applies only to federal agencies. Prior to 1974, the FOIA did not itself define "agency" but, rather, relied on the Administrative Procedure Act, which defines agency as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency," subject to certain exceptions not applicable here. 5 U.S.C. § 551(1). In 1974, Congress amended the FOIA to clarify that the § 551(1) definition of agency, as applied to the FOIA, "includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the

8

Government (including the Executive Office of the President), or any independent regulatory agency." FOIA Amendments of 1974, Pub. L. No. 93-502, sec. 3, § 552(e), 88 Stat. 1561, 1564 (codified as amended at 5 U.S.C. § 552(f)(1)) (emphasis added). Main Street argues that the highlighted FOIA language is unambiguous and, therefore, dispositive of the single issue on this appeal: the NSC is an "establishment in the executive branch of the Government" within "the Executive Office of the President" and, therefore, an "agency" subject to the FOIA.

Generally, "if the intent of Congress is clear and unambiguously expressed by the statutory language at issue, that would be the end of our analysis." Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ., 550 U.S. 81, 93 (2007); see United States v. Colasuonno, 697 F.3d 164, 173 (2d Cir. 2012). The Supreme Court, however, has not strictly applied this rule in construing the above-highlighted language of the FOIA. Rather, in Kissinger v. Reporters Committee for Freedom of the Press, 445 U.S. 136, 155–57 (1980), the Court looked to the FOIA's legislative history in concluding that notes made by the President's National Security Advisor were not agency records subject to the FOIA. The history referenced in Kissinger indicates that Congress did not intend for "'the President's immediate personal

9

staff or units in the Executive Office [of the President] whose sole function is to advise and assist the President'" to be "included within the term 'agency' under the FOIA." Id. at 156 (quoting H.R. Rep. No. 93-1380 (1974) (Conf. Rep.), reprinted in Subcomm. on Gov't Info & Indiv. Rights of the H. Comm. on Gov't Operations, 94th Cong., Freedom of Information Act and Amendments of 1974 (P.L. 93-502), Source Book: Legislative History, Texts, and Other Documents ("FOIA Source Book") 219, 232 (Joint Comm. Print 1975), available at http://1.usa.gov/1FMmbfm). Thus, to decide this appeal, we must look beyond the text of § 552(f)(1) and consider whether the NSC is a unit within the Executive Office of the President whose "sole function" is to advise and assist the Chief Executive.[5]

---

[5] Although Main Street argues that Kissinger's reliance on legislative history has been called into question by subsequent decisions relating to statutory construction, none of those decisions construes § 552(f)(1). Accordingly, as to that statutory text, we remain bound by Kissinger until that decision is overruled by the Supreme Court. See Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."); accord United States v. Gomez, 580 F.3d 94, 104 (2d Cir. 2009).

B.    The "*Soucie* Test" for Determining a FOIA "Agency"

In making such a function determination, we are mindful that Congress derived the standard quoted in Kissinger from Soucie v. David, 448 F.2d 1067 (D.C. Cir. 1971).  See H.R. Rep. No. 93-1380 (Conf. Rep.), reprinted in FOIA Source Book at 232 ("With respect to the meaning of the term 'Executive Office of the President' the conferees intend the result reached in Soucie v. David." (citation omitted)); see also Armstrong v. Exec. Office of the President, 90 F.3d at 558 (recognizing Congress's intent "to codify Soucie" in 1974 amendments' agency definition); Meyer v. Bush, 981 F.2d 1288, 1291 (D.C. Cir. 1993) (same). Soucie construed the Administrative Procedure Act's definition of "agency," referencing government "authority," to reach executive branch units that have "substantial independent authority in the exercise of specific functions," 448 F.2d at 1073 (citing 5 U.S.C. § 551(1)), but not to reach units whose "sole function [is] to advise and assist the President," id. at 1075.  Soucie applied these two prongs of analysis to the Office of Science and Technology, a unit within the Executive Office of the President, and concluded that it was an agency subject to the FOIA because, in addition to advising and assisting the President, the Office had inherited program evaluation functions from the National Science Foundation that Congress had imposed as a delegation of "some of its own broad power of

inquiry." Id.  It was based on the latter independent authority, derived from a source other than the President, that the Office was held to be an agency.  See id.

Thus, although the Supreme Court in Kissinger quoted only the "sole function" prong of the Soucie analysis, we understand it to have recognized Congress's intent to codify the entirety of the Soucie test for entities within the Executive Office of the President.  We therefore consider both the "sole function" and "substantial independent authority" prongs of Soucie analysis in deciding whether the NSC is an agency subject to the FOIA.

C.      The D.C. Circuit's Experience with *Soucie* Analysis

Before ourselves applying Soucie analysis to the NSC, we acknowledge the considerable experience of the Court of Appeals for the District of Columbia Circuit in applying this analysis to various units within the Executive Office of the President.  Since Soucie, that court has twice held such units to be agencies. See Pacific Legal Found. v. Council on Envtl. Quality, 636 F.2d 1259 (D.C. Cir. 1980) (Council on Environmental Quality); Sierra Club v. Andrus, 581 F.2d 895 (D.C. Cir. 1978) (Office of Management and Budget), rev'd on other grounds sub nom. Andrus v. Sierra Club, 442 U.S. 347 (1979).  Once, in the absence of any dispute on the point, that court appears to have assumed a unit's agency status, while nevertheless holding the requested document exempt from FOIA

12

disclosure. See Center for Int'l Envtl. Law v. Office of U.S. Trade Representative, 718 F.3d 899 (D.C. Cir. 2013) (Office of Trade Representative). In five other cases, however, the D.C. Circuit has held units within the Executive Office of the President—including the NSC—not to be agencies. See Citizens for Responsibility & Ethics in Washington v. Office of Admin., 566 F.3d 219 (D.C. Cir. 2009) (Office of Administration); Armstrong v. Exec. Office of the President, 90 F.3d 553 (NSC)[6]; Sweetland v. Walters, 60 F.3d 852 (D.C. Cir. 1995) (Executive Residence)[7]; Meyer v. Bush, 981 F.2d 1288 (Task Force on Regulatory Relief); Rushforth v. Council of Econ. Advisers, 762 F.2d 1038 (D.C. Cir. 1985) (Council of Economic Advisers).

In certain of these cases, including the one in which it concluded that the NSC was not an agency, the D.C. Circuit has conducted Soucie analysis by

[6] In the almost twenty years since the D.C. Circuit held the NSC not to be an agency subject to the FOIA, Congress has made no effort to reverse that decision.

[7] Although the Executive Residence was not a part of the Executive Office of the President when Sweetland was decided, the court treated it as if it were. See Sweetland v. Walters, 60 F.3d at 854. Since then, the Executive Residence has been moved into the Executive Office of the President. See Whether the Office of Admin. Is an "Agency" for Purposes of the Freedom of Information Act, 31 Op. O.L.C. 200, 205 n.3 (2007) (citing Memorandum from Andrew H. Card, Jr., White House Chief of Staff, to Gary Walters, Chief Usher, Executive Residence (June 11, 2002)); see also Executive Office of the President, https://www.whitehouse.gov/administration/eop (last visited January 25, 2016) (listing Executive Residence as part of Executive Office of President).

reference to three factors: (1) "how close operationally" the unit at issue "is to the President," (2) "whether [the unit] has a self-contained structure," and (3) "the nature of its delegat[ed]" authority. Meyer v. Bush, 981 F.2d at 1293; Armstrong v. Exec. Office of the President, 90 F.3d at 558. Thus, as to the NSC, the D.C. Circuit recognized its self-contained structure to tilt in favor of agency status, but concluded that this was outweighed by its close operational proximity to the President and by its lack of authority to do more than advise and assist the President in making or implementing his policies. See Armstrong v. Exec. Office of the President, 90 F.3d at 559–65.

Main Street criticizes this three-factor approach for giving insufficient attention to the "sole function" prong of Soucie. See Appellant's Br. 40–47.[8] We need not here decide when, if at all, this trio of factors might be useful to Soucie analysis.[9] With the benefit of the D.C. Circuit's experience applying Soucie to

---

[8] The dissent in Armstrong also criticized this approach, arguing that an entity within the Executive Office of the President should be deemed an agency subject to the FOIA if it did "anything apart from advising the President and assisting him in what he does," and, specifically, if it "exercis[ed] authority in a way that has concrete effects either on the interests of private citizens or on other parts of the government." Armstrong v. Exec. Office of the President, 90 F.3d at 567, 570 (Tatel, J., dissenting).

[9] As the D.C. Circuit has itself explained, the three factors were not intended to inject anything new into the Soucie inquiry, but simply to "capture the court's

units within the Executive Office of the President, but without being controlled by its three-factor analysis (or by alternatives proposed in other D.C. Circuit opinions), we proceed to our own consideration of whether the NSC—either the Council specifically or the NSC System generally—is an agency subject to the FOIA.

 D. The Council Is Not an Agency Subject to the FOIA

 1. The Council's Sole Statutory Function Is To Advise and Assist the President

To determine the function of a statutorily created entity such as the National Security Council, a court properly begins with the authorizing legislation. See Citizens for Responsibility & Ethics in Washington v. Office of Admin., 566 F.3d at 224 (beginning analysis with entity's "charter documents"). In creating the Council, Congress stated as follows:

---

prior learning on the subject whether a unit within the Executive Office of the President is an agency covered by the FOIA." Armstrong v. Exec. Office of the President, 90 F.3d at 558 (observing that each of three identified factors "warrants consideration insofar as it is illuminating in the particular case"). The court has more recently observed that "common to every case" in which it has held a unit within the Executive Office of the President to be an agency is "a finding that the entity in question wielded substantial authority independently of the President." Citizens for Responsibility & Ethics in Washington v. Office of Admin., 566 F.3d at 222 (internal quotation marks omitted).

> The function of the Council shall be to advise the President with respect to the integration of domestic, foreign, and military policies relating to the national security so as to enable the military services and the other departments and agencies of the Government to cooperate more effectively in matters involving the national security.

50 U.S.C. § 3021(a) (emphasis added). Such use of the definite article to describe "the function" of the Council in the legislation's first subsection makes clear that the sole function statutorily conferred on the Council is advisory to, and not independent of, the President. See Rumsfeld v. Padilla, 542 U.S. 426, 434 (2004) (stating that statutory use of definite article "indicates that there is generally only one" of referenced noun). This is only reinforced by the fact that the President is the presiding member of the Council. See 50 U.S.C. § 3021(a). Council members may head government departments with independent authority in their respective spheres. Indeed, it is precisely for that reason that their advice is sought with respect to the "integration" of diverse policies relating to national security, i.e., to secure "cooperat[ion in] more effectively" exercising their respective departments' authority "in matters involving the national security." Id. But when serving as the Council itself, their sole function is advisory to the

16

President.  Nothing in the legislation confers non-advisory functions on the

Council as a body, much less any authority independent of the President.[10]

This contrasts with Congress's treatment of other units within the

Executive Office of the President, such as the Office of Science and Technology

and the Office of the Trade Representative.  Soucie recognized the former as an

"agency" "[b]y virtue of its independent function of evaluating federal

programs," which reflected Congress's statutory "delegat[ion of] some of its own

---

[10] In explaining the work of the Council, former NSC Executive Secretary Sidney W. Souers and former National Security Advisor Robert Cutler both cited § 3021(a) in emphasizing the Council's singular advisory function:

> It should, therefore, be clear that the Council itself does not determine policy.  It prepares advice for the President as his Cabinet-level committee on national security.  With complete freedom to accept, reject, and amend the Council's advice and to consult with other members of his official family, the President exercises his prerogative to determine policy and to enforce it.

Sidney W. Souers, Policy Formulation for National Security, Am. Pol. Sci. Rev., June 1949, reprinted in Organizing for Nat'l Sec. 146, 148.

> The Council's role is advisory only.  It recommends; it does not decide.  Whatever security policy may be finally approved by the President, after such modifications or rejections of the Council's views as he may determine, is the policy, not of the Council, but of the Chief Executive.

Robert Cutler, The Development of the National Security Council, Foreign Affairs, Apr. 1958, reprinted in Organizing for Nat'l Sec. 166, 167.

"broad power of inquiry" to that entity.  <u>Soucie v. David</u>, 448 F.2d at 1075 (emphasis added).  As for the Office of the Trade Representative, which did not dispute its agency status in arguing for a FOIA exemption in <u>Center for International Environmental Law v. Office of U.S. Trade Representative</u>, 718 F.3d 899, Congress statutorily granted it independent authority to enforce trade agreements in 19 U.S.C. § 2411(c).

> 2.  <u>The Statute's "Additional Functions" Subsection Confers No Authority on the Council Independent of the President</u>

Nor can a grant of independent authority be located in the next, "Additional functions," subsection of the National Security Act, which imposes duties on the Council, "[i]n addition to performing such other functions as the President may direct."  50 U.S.C. § 3021(b).  To explain, we reproduce the full text of the subsection in the margin, highlighting it so as to show three parts.[11]  The

---

[11] Section 3021(b) states as follows:

> <u>In addition to performing such other functions as the President may direct</u>, *for the purpose of more effectively coordinating the policies and functions of the departments and agencies of the Government relating to the national security*, it shall, subject to the direction of the President, be the duty of the Council—
>
> (1) to assess and appraise the objectives, commitments, and risks of the United States in relation to our actual and potential military

opening clause—<u>underscored</u>—implicitly recognizes the President's authority to assign additional functions to the Council (the "'other functions' clause"). The enumerated part—regular typeface—identifies two functions that Congress requires the Council to perform in any event (the "enumerated functions provisions"). Between these two parts is a third—*italicized*—specifying the purpose for which the Council is to perform its additional functions: "more effectively coordinating the policies and functions of the departments and agencies of the Government relating to the national security" (the "purpose phrase").

This structure confirms that the Council is more appropriately viewed as a forum attended by actors exercising independent authority within their respective spheres, not an actor itself, much less one exercising authority independent of the President. The enumerated functions provisions make it the

power, in the interest of national security, for the purpose of making recommendations to the President in connection therewith; and

(2) to consider policies in matters of common interest to the departments and agencies of the Government concerned with the national security, and to make recommendations to the President in connection therewith.

50 U.S.C. § 3021(b) (emphases added).

19

Council's duty to "assess," "appraise," and "consider" certain security matters, but only "subject to the direction of the President" and in order to make "recommendations to the President in connection therewith." Recommendations do not manifest an exercise of independent authority. Rather, they are advice to the person with authority to act on them—here, the President. Thus, § 3021(b)'s "[a]dditional functions" are best understood simply to particularize the overall advisory function of § 3021(a).

The purpose phrase of § 3021(b) further supports this conclusion. Its coordination objective—"more effectively coordinating the policies and functions" of government entities "relating to the national security"—echoes the integration and cooperation goals of § 3021(a)'s advisory function. Indeed, "coordination" is a term long associated with the NSC and with the integration objectives of the National Security Act, referenced supra note 2. See National Security Act of 1947, tit. I, 61 Stat. at 496 (entitling portion of National Security Act creating NSC "Coordination for National Security"); H.R. Rep. No. 80-961, at 3 (1947) (stating that NSC would meet "urgent need for a continuous program of close coordination between our domestic, foreign, and military policies"); S. Rep. No. 80-239, at 9 (1947) (stating that NSC is intended to meet "need for closer and

20

continuous coordination on a high level within the Government of our domestic, foreign, and military policy"); PPD-1, at 2 (stating that NSC shall be President's "principal means for coordinating executive departments and agencies in the development and implementation of national security policy"). Thus, "coordination" within the Council involves no exercise of authority independent of the President, or even of the agencies whose heads are Council members. Certainly, there is no mechanism for a majority of the Council—in the absence of a presidential directive—to compel member action within the departments they head. Rather, "coordination" within the Council is the means by which the President can secure both the collective national security recommendations of department heads and their cooperation in integrating his policies across various parts of government. The former function is solely to advise, the latter solely to assist.[12]

---

[12] Former National Security Advisor Cutler has employed a "policy hill" metaphor to describe the coordination process. Cutler, supra note 10, at 172. Upward coordination involves representatives of various entities sending policy recommendations to the Council, "where they are thrashed out and submitted to the President." Id. "When the President has approved a policy recommendation," downward coordination assists in its implementation across various departments and agencies. Id. In short, the Council, as an entity, cannot itself dictate to either citizens or parts of government. That authority is exercised by independent department heads at the direction of the President.

With this understanding, we conclude that where a statutory subsection identifying "[t]he function" of the Council as advising the President, 50 U.S.C. § 3021(a), is followed by a subsection particularizing duties to coordinate that advice, language signaling that the specified duties are not exclusive, but in addition to "such other functions as the President may direct," cannot reasonably be construed as a congressional delegation of independent authority to the Council. As the Supreme Court has observed, Congress "does not . . . hide elephants in mouseholes." Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 468 (2001). Thus, when we consider § 3021(b)'s "other functions" clause in context, see generally Utility Air Regulatory Grp. v. EPA, 134 S. Ct. 2427, 2441 (2014) (referencing "fundamental" construction canon that statutory language be read in context, with view to place in overall statutory scheme (internal quotation marks omitted)), we construe it to mean that "for the purpose of more effectively coordinating the policies and functions" of government entities "relating to the national security," the President may direct the National Security Council to provide him with particular advice and assistance beyond that specifically identified in that statutory subsection.

In sum, we conclude that the sole statutory authority conferred on the Council is to advise and assist the President, both in general, as stated in § 3021(a), and for the specific purpose of effectively coordinating that advice and assistance as provided in § 3021(b).[13]  Because the Council lacks any authority independent of the President, it is not an agency subject to the FOIA.  See Soucie v. David, 448 F.2d at 1075 (looking to statutory functions to determine agency status).

>        3.      Non-Statutory References to the NSC as an "Agency" Provide No Assistance Here, Having Occurred When the NSC Was Statutorily Authorized To Direct the CIA, Which Authority Has Now Been Withdrawn

In urging otherwise, Main Street highlights certain non-statutory references to the NSC as an "agency."  First, it cites the House Report on the 1974 FOIA amendments, see H.R. Rep. No. 93-876 (1974), reprinted in FOIA Source Book 121, 128, which included the NSC on a list of entities expected to come within the proposed reference to "establishment in the Executive Office of the

---

[13] The NSC's singular function is further evident in 50 U.S.C. § 3021(d) ("The Council shall, from time to time, make such recommendations, and such other reports to the President as it deems appropriate or as the President may require.").

23

President."[14]  Second, it observes that, in <u>Kissinger v. Reporters Committee for Freedom of the Press</u>, the Supreme Court cited this House Report as support for an assumption that the NSC was an agency subject to the FOIA.  <u>See</u> 445 U.S. at 156.  Third, it points to a 1978 opinion from the Department of Justice's Office of Legal Counsel ("OLC") concluding that the NSC is an agency subject to the FOIA.  <u>See</u> <u>Freedom of Information Act (5 U.S.C. § 552)—Nat'l Sec. Council—Agency Status Under FOIA</u>, 2 Op. O.L.C. 197 (1978).  None of these references will bear the weight assigned to them by Main Street.

The House Report was supplanted by the Conference Report, which made no attempt to identify entities within the Executive Office of the President that were or were not subject to the FOIA.  <u>See generally</u> <u>Slayton v. Am. Express Co.</u>, 604 F.3d 758, 771 (2d Cir. 2010) (noting that "conference report is generally the most reliable evidence in legislative history of congressional intent because it represents the final statement of the terms agreed to by both houses" (internal quotation marks omitted)).  Rather, the Conference Report cites <u>Soucie v. David</u>

---

[14] The House Report states that "[t]he term 'establishment in the Executive Office of the President' as used in this amendment, means such functional entities as the Office of Telecommunications Policy, the Office of Management and Budget, the Council of Economic Advisers, the National Security Council, the Federal Property Council, and other similar establishments which have been or may in the future be created by Congress through statute or by Executive order."  <u>Id.</u>

24

in expressing the conferees' intent <u>not</u> to reach the President's immediate personal staff or those units of the Executive Office whose sole function is to advise or assist the President.  <u>See</u> H.R. Rep. No. 93-1380 (Conf. Rep.), <u>reprinted in</u> <u>FOIA Source Book</u> 232.  As noted <u>supra</u> at **[9–10]**, it is this Conference Report on which the Supreme Court relied in construing § 552(f)'s reach by reference to the <u>Soucie</u> standard in <u>Kissinger</u>.

<u>Kissinger</u>'s assumption that the NSC was an agency was made only <u>arguendo</u> in concluding, nonetheless, that the plaintiffs in that case had failed properly to make a FOIA request for any NSC records.  <u>See</u> <u>Kissinger v. Reporters Comm. for Freedom of the Press</u>, 445 U.S. at 156–57.  Such an assumption is not even <u>dictum</u> and, thus, hardly resolves this appeal.

As for the OLC Opinion, it was withdrawn in 1993, supplanted by the conclusion that the NSC was not an agency subject to the FOIA.  <u>See</u> Memorandum from Walter Dellinger, Acting Ass't Att'y Gen., Office of Legal Counsel, to Alan J. Kreczko, Spec. Ass't to the President and Legal Adviser, Nat'l Sec. Council (Sept. 20, 1993).

The change in OLC positions is attributable, at least in part, to a fact that undermines Main Street's reliance on all three cited references.  <u>See</u> <u>id.</u> at 6–7.  At

the time of these references, the NSC was statutorily authorized to direct the Central Intelligence Agency ("CIA"). See National Security Act of 1947 § 102(a), (d), 61 Stat. at 497–98 (creating CIA "under" NSC and setting forth CIA duties "under the direction of the National Security Council"). That authority, however, has now been withdrawn. See Intelligence Organization Act of 1992, Pub. L. No. 102-496, tit. VII, § 704, 106 Stat. 3188, 3189 (removing language that CIA was "under" NSC); see also National Security Reform Act of 2004, Pub. L. No. 108-458, tit. I, § 1011, 118 Stat. 3643, 3643–62 (removing remaining NSC authority over CIA). In short, the cited references to the NSC as an agency were made at a time when the NSC oversaw the CIA, which is itself an agency subject to the FOIA. See CIA v. Sims, 471 U.S. 159 (1985) (applying FOIA to CIA); Center for Constitutional Rights v. CIA, 765 F.3d 161 (2d Cir. 2014) (same). Those references say nothing about whether the NSC—as it exists today—functions as an agency under the Soucie standard. Accordingly, they do not assist, much less dictate, resolution of this appeal.

We, therefore, adhere to our conclusion, reached by applying Soucie analysis to the text of the National Security Act, that the Council is not an agency

subject to the FOIA because its sole statutory function is to advise and assist the President.[15]

E. The NSC System Is Not an Agency Subject to the FOIA

We now consider whether, even if the Council itself is not an agency subject to the FOIA, a different conclusion might apply to the NSC System. Parts of the NSC System are created by statute, specifically, the NSC Staff, the Board for Low Intensity Conflict, and the Committees on Foreign Intelligence and Transnational Threats. See 50 U.S.C. § 3021(c), (g)–(i).[16] Parts are created by

---

[15] Insofar as Main Street argues that the President has himself empowered the Council, or the NSC of which it is a part, to exercise authority independent of him and to perform functions that do more than advise and assist, we explain infra at [37–59] why those arguments fail.

[16] It is not clear that the statutory board or committees presently exist. See PPD-1 (making no mention of Board for Low Intensity Conflict, Committee on Foreign Intelligence, or Committee on Transnational Threats in directing organization of NSC System); see also 142 Cong. Rec. 23,324 (1996) (statement of Sen. Bob Kerrey (D. Neb.), co-sponsor of bill creating Committees on Foreign Intelligence and on Transnational Threats, acknowledging that these committees could become "moribund bodies" as had Board for Low Intensity Conflict). Nevertheless, to the extent their statutory functions may have been assigned by the President to other parts of the NSC System, see generally George W. Bush, National Security Presidential Directive 1, at 6 (2001), available at https://www.hsdl.org/?view&did=462808 (assigning functions of statutory committees to other, presidentially-created committees), we consider whether the NSC System thereby exercises authority independent of the President.

presidential directive.  See PPD-1.  We address the two separately but, in the end,

reach a single conclusion: the NSC System is not an agency subject to the FOIA.[17]

### 1. The NSC System Is Not Statutorily Granted Any Authority Independent of the President

In considering what statutory authority Congress conferred on staff,

boards, and committees of the NSC System, we are ever mindful that atop this

system sits the Council, which, for reasons just discussed, we conclude has been

granted no statutory authority independent of the President but, rather, has been

assigned only the function of advising and assisting the President.  This gives

rise to a strong presumption that Congress intended to confer no more authority

on the NSC System than it conferred on the Council at its head.  The relevant

statutory text, which we now discuss, warrants no different conclusion.

#### a. NSC Staff

The National Security Act provides for the NSC to have a staff "to perform

such duties as may be prescribed by the Council in connection with the

performance of its functions."   50 U.S.C. § 3021(c).   As we have already

---

[17] Because we conclude that no part of the NSC System is authorized—by Congress or the President—to exercise authority independent of the President or to do more than advise and assist the President, we need not here decide whether such a grant of authority would transform the entire NSC System or only a part into an agency subject to the FOIA.

explained, the Council's functions are solely advisory; it is granted no authority independent of the President. Thus, it can hardly confer on its staff more authority than it has itself. Any duties the NSC assigns to its staff "in connection with the performance of its functions," therefore, must also be deemed only to advise, or to assist in advising or assisting.

In this respect, we emphasize that the relevant <u>Soucie</u> inquiry is not whether an entity enjoys a measure of discretion, or independence, in how it provides advice or assistance. That is true to some degree of most advisers and assistants. Rather, <u>Soucie</u> asks whether an entity does more than render advice or assistance to the President—whether it exercises authority independent of the President, particularly with respect to individuals or other parts of government. Nothing in § 3021(c) admits a conclusion that the NSC staff exercises any such independent authority.

b. <u>The Board for Low Intensity Conflict</u>

In 1986, Congress amended the National Security Act to provide for the President's "establish[ment]" within the NSC System of "a board to be known as the 'Board for Low Intensity Conflict.'" J. Res. of Oct. 30, 1986, Pub. L. No. 99-591, § 9115(f), 100 Stat. 3341, 3341-125 (codified at 50 U.S.C. § 3021(g)). The "principal," and sole statutorily identified, function of this board is "to

29

coordinate the policies of the United States for low intensity conflict."  50 U.S.C. § 3021(g).

We have already explained that "coordination" within the NSC is a means for securing national security policy recommendations to the President (advice) and consistent implementation of the President's policy decisions (assistance) across government departments.  Such coordination does not contemplate the NSC's exercise of authority independent of the President.  See supra at **[20–21]**. Thus, because coordination is the sole function statutorily assigned to the Board for Low Intensity Conflict, and because the statute gives the Board no authority to dictate to persons or departments, we conclude that the Board is not an agency subject to the FOIA.

### c.      The Committee on Foreign Intelligence

In 1996, Congress added a Committee on Foreign Intelligence to the NSC System.  See Intelligence Renewal and Reform Act of 1996, Pub. L. No. 104-293, tit. VIII, § 802, 110 Stat. 3474, 3474–75 (codified as amended at 50 U.S.C. § 3021(h)).  This Committee is composed of the President's National Security Advisor, who serves as chair, the Director of National Intelligence, the Secretaries of State and Defense, and such other members as the President may designate.  See 50 U.S.C. § 3021(h)(2).  Its sole statutory function is "to assist" the

NSC and, thereby, the President, by undertaking certain activities, set forth fully

in the margin.  Id. § 3021(h)(3).[18]

---

[18] Title 50 U.S.C. § 3021(h) states that

> (3) The function of the Committee [on Foreign Intelligence] shall be to assist the Council in its activities by—
>> (A)  identifying the intelligence required to address the national security interests of the United States as specified by the President;
>> (B)  establishing priorities (including funding priorities) among the programs, projects, and activities that address such interests and requirements; and
>> (C)  establishing policies relating to the conduct of intelligence activities of the United States, including appropriate roles and missions for the elements of the intelligence community and appropriate targets of intelligence collection activities.
>
> (4) In carrying out its function, the Committee shall—
>> (A)  conduct an annual review of the national security interests of the United States;
>> (B)  identify on an annual basis, and at such other times as the Council may require, the intelligence required to meet such interests and establish an order of priority for the collection and analysis of such intelligence; and
>> (C)  conduct an annual review of the elements of the intelligence community in order to determine the success of such elements in collecting, analyzing, and disseminating the intelligence identified under subparagraph (B).
>
> (5) The Committee shall submit each year to the Council and to the Director of National Intelligence a comprehensive report on its activities during the preceding year, including its activities under paragraphs (3) and (4).

As is apparent from the listed activities, the Committee assists the NSC by reporting and recommending on, as well as coordinating, the nation's intelligence gathering efforts as required to address national security interests "specified by the President." Id. Insofar as the Committee is also charged with establishing priorities (including funding priorities) among intelligence programs, and policies relating to the roles of various elements of the intelligence community and the targets of intelligence activities, see id., such provisions might suggest independent authority if read in isolation. But statutory text is not properly construed in isolation; it must be read in context. See Utility Air Regulatory Grp. v. EPA, 134 S. Ct. at 2441. The context in which the Committee on Foreign Intelligence takes any of the actions listed in § 3021(h)(3) is established by its singular statutory function: "to assist the Council"—an entity whose sole statutory function, as we have already concluded, is to advise and assist the President. Where Congress thus grants only advisory and assistance functions to entities within a hierarchical system headed by the President, we identify no legislative intent to confer authority independent of the President on that system. Rather, we conclude that the Committee on Foreign Intelligence, like the Council, provides a forum for specified persons to identify national

security needs, priorities, and policies in order to transmit their recommendations upward for further action, and to provide guidance downward so that diverse departments—each acting pursuant to the authority of its own head—can effectively coordinate implementation of the President's policies.

Our reading of the text not to confer independent authority on the Committee is further supported by legislative history. See H.R. Rep. No. 104-832, at 38 (1996) (Conf. Rep.) (stating intent for Committee on Foreign Intelligence "to provide better guidance to the intelligence community"); S. Rep. No. 104-258, at 26 (1996) (stating intent "to provide policy-level guidance for the conduct of U.S. intelligence activities").

In sum, because the sole function of the Committee on Foreign Intelligence is to assist the Council, and thereby, the President, and because it provides only guidance, not directives, to other parts of government, we conclude that it exercises no independent authority and, therefore, is not an agency subject to the FOIA.

### d. The Committee on Transnational Threats

At the same time that Congress added the Committee on Foreign Intelligence to the NSC System, it also added the Committee on Transnational

Threats. See Intelligence Renewal and Reform Act of 1996 § 804, 110 Stat. at 3476–77 (codified as amended at 50 U.S.C. § 3021(i)). That Committee consists of the President's National Security Advisor, who serves as chair, as well as the Director of National Intelligence, the Secretaries of State and Defense, the Attorney General, and such other members as the President may designate. See 50 U.S.C. § 3021(i)(2). Its single statutory function is "to coordinate and direct the activities of the United States Government relating to combatting transnational threats." Id. § 3021(i)(3).

We have already explained why "coordination" within the NSC System does not contemplate the exercise of any authority independent of the President. See supra at **[20–21]**. As for the word "direct," while it can imply an exercise of authority, it does not always. "Direct" can mean "to manage or guide by advice, helpful information, instruction, etc." Random House Webster's Unabridged Dictionary 558 (2d ed. 2001); see also Webster's Third New International Dictionary 640 (1993) (defining "direct" to mean, inter alia, "to assist by giving advice, instruction, and supervision"); 4 The Oxford English Dictionary 701 (2d ed. 1989) (defining "direct" to mean, inter alia, "[t]o regulate the course of; to guide, conduct, lead; to guide with advice, to advise"). Here, the statutory text,

34

context, and legislative history support construing the word to have such an advisory meaning.[19]

Section 3021(i)(4) lists actions that the Committee on Transnational Threats shall undertake "in carrying out its function." These include identifying transnational threats, developing strategies to combat those threats, monitoring the implementation of those strategies, assisting in the resolution of policy differences among agencies, developing policies to improve data sharing, and developing guidelines to improve coordination. See id. Such activities—identifying problems, developing best practices, monitoring implementation—are precisely those expected of an advisory body. Nowhere does the statute

---

[19] In reaching this conclusion, we are mindful of the narrowness of the FOIA exception posited by the Conference Report, and by the Soucie case to which it refers, both of which emphasize that in order to escape the definition of "agency," a unit of the Executive Office of the President must have the "sole function" of advising and assisting the President. See Soucie v. David, 448 F.2d at 1075; H.R. Rep. No. 93-1380 (Conf. Rep.), reprinted in FOIA Source Book 232. Thus, a unit delegated independent governmental authority over the public or other parts of government could not claim the exception simply because it performed some advisory functions. At the same time, however, in considering whether statutory language does, in fact, confer independent authority on part of a unit, we give due regard to the unit's predominant function. Where, as here, Congress has created a hierarchical national security system to provide advice and assistance to the President in defining and implementing his policies, we will not readily assume from a single word that Congress's intent was to convey independent authority on a part inconsistent with the nature of the unit as a whole.

confer on the Committee any authority itself to act on identified problems, to enforce policies or guidelines, or otherwise to dictate action to any persons or entities. To the contrary, by placing this Committee within a system of fora, atop which sits a Council whose sole function is to advise and assist the President, Congress signaled its intent that the Committee on Transnational Threats also function advisorily rather than exercise independent authority.

The relevant conference report supports this conclusion, stating that the Committee on Transnational Threats was created "to provide senior-level guidance on issues raised by the intersection of law enforcement and intelligence." H.R. Rep. No. 104-832, at 38 (Conf. Rep.). That view was echoed by Senator Arlen Specter (R-Pa.), the Senate majority's floor manager for the legislation, who stated that the Committee's purpose was "to provide better policy guidance . . . for departments and agencies involv[ed] in fighting international terrorism and crime." 142 Cong. Rec. 23,322 (1996).

No different conclusion is warranted because the President and the Department of Justice objected to the creation of the Committee on Transnational Threats. Their concern was separation of powers, i.e., Congress's intrusion on the President's prerogative to decide which officials within the executive branch

would advise on his policies relating to transnational issues. Nothing in their objections suggests that the Committee was being granted authority independent of the President. See Statement on Signing the Intelligence Authorization Act for Fiscal Year 1997, 2 Pub. Papers 1813, 1813 (Oct. 11, 1996) (stating with respect to creation of Committee on Transnational Threats that Congress's "efforts to dictate the President's policy process unduly intrude upon Executive prerogatives and responsibilities"); see also S. Rep. No. 104-258, at 28–29 (noting Justice Department's view that "law enforcement activities should not be directed on the basis of considerations unrelated to the enforcement of law").

In sum, relevant statutory provisions provide for the various parts of the NSC System to perform functions that advise and assist the Council and the President. They confer no authority independent of the President so as to make the NSC System an agency subject to the FOIA.

2. The President Has Not Granted the NSC System Any Independent Authority

a. Presidential Delegations of Authority

Each President organizes the NSC System as he thinks will best assist him in carrying out his national security responsibilities. See, e.g., PPD-1, at 1 ("To assist me in carrying out my responsibilities in the area of national security, I

37

hereby direct that the National Security Council system be organized as follows."). Main Street maintains that the President has done so in a way that allows the NSC System to exercise national security authority independent of him, thereby making it an agency subject to the FOIA. We are not persuaded.

At the outset, we observe that a due regard for separation of powers signals judicial caution in assessing a claim that the nation's Chief Executive has so conveyed his authority to another person or entity that it can now be exercised independent of him. This is not to suggest that the President can never delegate executive authority. But the President alone decides the extent and conditions of any delegation. Moreover, he can revoke a delegation whenever he changes his mind or overrule any exercise with which he disagrees. For these reasons, we are skeptical as to whether a President can ever be said to have delegated his own authority in a way that renders it truly independent of him. See Meyer v. Bush, 981 F.2d at 1297 (noting even dissent's doubt that President "would ever delegate true independent authority to his cabinet," and reaching same conclusion with respect to task force composed in part of certain cabinet officials).

This contrasts with statutory grants of authority to executive departments or agencies, which flow from a source independent from the President. Thus, Congress can confer authority beyond the President's own. In such circumstances, the President may still give directions to executive agencies, and he can usually fire a recalcitrant agency head. But he cannot take away the agency's statutory authority or exercise it himself. See Free Enter. Fund v. Pub. Co. Accounting Oversight Bd., 561 U.S. 477, 493 (2010) (recognizing that Congress may vest appointment power in agencies rather than President); Myers v. United States, 272 U.S. 52, 135 (1926) (acknowledging that President may not always "overrule or revise" subordinate's action). Statutory grants therefore easily allow an entity within the executive branch to be deemed an "'authority of the Government of the United States'" that exercises power independent of the President. Soucie v. David, 448 F.2d at 1073 (quoting 5 U.S.C. § 551(1)). But presidential delegations of authority may not warrant that conclusion. They may simply make the entity an extension of the President, a vehicle for assisting him in exercising his authority when he cannot do so in person. See id. at 1075 (stating that entity that is "part of the President's staff" could not be "separate agency").

We need not here decide when, if ever, a presidential—rather than statutory—grant of authority might allow an executive entity to exercise power independent of the President so as to render it an agency subject to the FOIA. We decide only that no such agency conclusion is warranted here with respect to the NSC System.

        b.        *PPD-1* Clearly Expresses the President's Intent To Organize the NSC System To Assist Him in Exercising His Authority

In assessing a claim that the President has so conveyed his authority as to allow it to be exercised independent of him, separation of powers further counsels a respectful measure of deference to the President's own statements of intent in taking the action at issue. The first words of the President's Policy Directive organizing the NSC System clearly express his intent: "To assist me in carrying out my responsibilities in the area of national security, I hereby direct that the National Security Council system be organized as follows." PPD-1, at 1 (emphasis added). The highlighted language makes plain that the President organized the NSC System only to secure assistance for himself in carrying out his responsibilities. Nothing in the directive indicates any intent to transfer presidential authority so that it can be exercised independent of the President. In this regard, we reiterate a point made earlier: the relevant Soucie inquiry is not

40

whether a unit within the Executive Office of the President can exercise some discretion in providing the President with advice and assistance. It is whether advice and assistance to the President is the unit's sole function, or whether it is empowered to exercise authority independent of the President. When we apply Soucie analysis to PPD-1, we easily conclude from its plain language that it establishes assistance to the President as the sole function of the NSC System and conveys no authority to act independent of the President either with respect to private persons or other government entities.

        c.     *PPD-1* Grants Non-Statutory Committees No Authority Independent of the President

Despite PPD-1's plain statement of presidential intent only to secure assistance from the NSC System, Main Street argues that the President has therein organized non-statutory NSC committees so that they do exercise authority independent of him. For the reasons that follow, PPD-1 does not support that conclusion.

        (1)     The Principals Committee

The Principals Committee referenced in PPD-1 has operated since 1989 as "the senior interagency forum for consideration of policy issues affecting

national security." PPD-1, at 2–3 (emphasis added).[20]  Obviously, it assists the President in carrying out his national security responsibilities to have heads of various executive departments meet together and jointly consider issues affecting national security.  The coordination objective at the core of the NSC's authorizing legislation contemplates both channeling jointly considered policy recommendations up to the Council, and thereby to the President, and channeling the President's policy decisions down for consistent implementation across departments.  See supra at **[20–21]**.

The fact that the Principals Committee may reach "'conclusions'" and "'decisions'" does not manifest an exercise of independent authority by the committee.  See Appellant's Br. 24 (quoting PPD-1, at 3).  There may be a "conclusion" that a national security policy needs to be formulated or clarified and a "decision" to refer it to the Council and, thereby, to the President himself.  That circumstance manifests advice and assistance to the President, not the

---

[20] The National Security Advisor chairs the Principals Committee, on which serve the Secretaries of State, Treasury, Defense, Energy and Homeland Security; the Attorney General; the Director of the Office of Management and Budget; the U.S. Representative to the United Nations; the President's Chief of Staff; the Director of National Intelligence; and the Chairman of the Joint Chiefs of Staff.  Other designated persons can be invited to all or some meetings depending on the agenda.  See PPD-1, at 3.

exercise of authority independent of him.[21]  Or there may be a "conclusion" to coordinate agencies' implementation of a particular presidential policy and a "decision" about how to achieve that.  In that circumstance, however, the Principals Committee does not itself exercise independent authority.  Rather, it serves as a forum for members to coordinate the action authority of their individual agencies in furthering presidential policies.  Such a coordinating forum assists the President but exercises no authority independent of either him or the forum's members.

### (2)    The Deputies Committee

The Deputies Committee, as its name suggests, consists of persons serving as deputies to the ranking officials serving on the Principals Committee.  See PPD-1, at 4.  It thus occupies the rung below the Principals Committee in the NSC hierarchy.  The Deputies Committee "help[s] ensure that issues being brought before the [Principals Committee] or the NSC have been properly

---

[21] See generally Anderson, supra note 2, at 163–64 (describing value of having interdepartmental groups within NSC test policy proposals before submission to Council:  "[M]any differences are reconciled" in this process, "much common ground is found, and many disagreements prove after full discussion to be illusory and not basic differences after all.  But if an irreconcilable disagreement arises between the departments represented," the "elements of the disagreement" and "alternative policy courses" can be clearly identified for full presentation to Council).

analyzed and prepared for decision." Id. at 3. This is plainly a function intended to assist the Principals Committee and the Council, which in turn advises and assists the President. See generally Cutler, supra note 10, at 170 (discussing importance of having items presented for Council deliberation on basis of "carefully staffed and carefully written documents"). It bespeaks no exercise of authority independent of the President.

The Deputies Committee also schedules "[p]eriodic reviews of the Administration's major foreign policy initiatives . . . to ensure that they are being implemented in a timely and effective manner," and to "consider whether existing policy directives should be revamped or rescinded." PPD-1, at 3–4. Such a review-and-recommendation process also serves only to assist the President in implementing his policies; it does not constitute authority independent of the President.

The Deputies Committee is "responsible for day-to-day crisis management, reporting to the National Security Council." Id. at 4. The qualifying obligation to report to the Council, over which the President himself presides, makes plain that the Committee's management responsibility involves

44

no exercise of authority independent of the President, but only the hands-on assistance needed for the President to respond to crises.

Finally, the Deputies Committee "review[s] and monitor[s] the work of the NSC interagency process," a task that includes setting up Interagency Policy Committees to review policies and develop options in respective areas. Id. at 3, 5. That this task only assists the President and exercises no authority independent of him is evident from the responsibilities of the Interagency Policy Committees.

### (3) The Interagency Policy Committees

The Interagency Policy Committees are "the main day-to-day fora for interagency coordination of national security policy." Id. at 5. As such, they "provide policy analysis for consideration by the more senior committees of the NSC system and ensure timely responses to decisions made by the President." Id. They also "review and coordinate the implementation of Presidential decisions in their policy areas." Id. In short, the Interagency Policy Committees' only task is to provide assistance within an NSC System that functions solely to advise and assist the President; the Committees exercise no authority independent of the President.

45

In urging otherwise, Main Street contends that a Justice Department investigation shows that, with respect to "policy decision-making for detention issues," authority independent of the President was exercised successively at each of three NSC committee levels: the Interagency Policy Committee, the Deputies Committee, and the Principals Committee. Appellant's Br. 26. In fact, the report cited for this assertion does not support it. See U.S. Dep't of Justice, Office of Insp. Gen., A Review of the FBI's Involvement in and Observations of Detainee Interrogations in Guantanamo Bay, Afghanistan, and Iraq (2009), available at http://1.usa.gov/1MqabYs.

The report states that "discussions" on various detention matters, including "processes for sorting detainees and later for the repatriation or release of detainees, took place in a Policy Coordinating Committee." Id. at 16–17. Such discussions are necessary to the "coordination" task assigned Interagency Policy Committees by the President. They are not an exercise of authority independent of the President. The cited report further states that "detainee issues" not resolved by an Interagency Policy Committee were raised to the Deputies Committee and, if not resolved there, to the Principals Committee. Id. at 17. This does not demonstrate each committee's exercise of authority independent of

46

the President.  Rather, it shows that where agency representatives in each committee could agree on how to coordinate detainee issues consistent with the President's policy, they did so, but where they encountered disagreements that they could not reconcile, they raised the issue to the next higher committee level. It is hardly surprising that department heads serving on the Principals Committee, many of whom also served on the National Security Council, were better able than their subordinates to reconcile certain disagreements to ensure their departments' coordinated compliance with the President's policies.  Nor is there any reason to think that if the Principals Committee could not do so, it would not have raised the matter to the Council for presidential decision.

In sum, we identify nothing in the President's organization of the NSC System that allows any part thereof to exercise authority independent of the President.  Rather, PPD-1 organizes the NSC System to establish a hierarchy of interagency fora for providing the President with information and recommendations on national security issues from across the executive branch, as well as for coordinating implementation of the President's policies across government departments.  Thus, we conclude that the NSC System, like the

Council, has a single function: to advise and assist the President. Because it exercises no independent authority, it is not an agency subject to the FOIA.

> ### d. Executive Orders Grant the NSC System No Authority Independent of the President

The various executive orders cited by Main Street also fail to support its argument that the NSC System exercises authority independent of the President.

One cited order provides for coordination, guidance, and dispute resolution in the area of emergency communications policy through the interagency process provided in PPD-1. See Exec. Order No. 13,618 § 2.1, 3 C.F.R. 273, 273–74 (2013). We have already concluded that coordination and guidance within the NSC System assist the President in implementing his policies; they do not constitute an exercise of independent authority. The same conclusion obtains with respect to dispute resolution through the PPD-1 interagency process. As we have explained, that process establishes a hierarchy of interagency fora for full discussion across government departments of national security issues and coordinated implementation by departments of the President's policies. But the resolution of disputes in this process appears to be consensual, thus narrowing the matters requiring Council and, ultimately, presidential attention. Nowhere does the order authorize any part of the NSC

System on its own to dictate a resolution to any objecting government department.

Another cited order provides for NSC review of both past covert operations and new proposed operations for the purpose of providing "support to the President" and submitting "to the President a policy recommendation." Exec. Order No. 13,470 sec. 2, § 1.2, 3 C.F.R. 218, 219–20 (2009).  This is entirely consistent with the NSC's statutory advisory function, and indicates no exercise of authority independent of the President.

Similarly, executive orders providing for the NSC to formulate or give policy direction for security programs affecting multiple agencies, or to approve or review such programs' directives or actions, do not reach beyond the NSC's advisory coordinating function.  See Exec. Order No. 13,603 § 104(a), 3 C.F.R. 225, 226 (2013) (providing for NSC, along with other bodies, to "serve as the integrated policymaking forum for consideration and formulation of national defense resource preparedness policy" and to make recommendations to President on use of statutory authority); Exec. Order No. 12,829 § 102(a)–(b), 3 C.F.R. 570, 570–71 (1994) (providing for NSC to give "overall policy direction" on National Industrial Security Program, to approve directives of that program, and

to resolve interagency disputes). Because the NSC is statutorily charged with advising the President as to the integration of policies requiring cooperation among diverse agencies, see 50 U.S.C. § 3021(a)–(b), we will not assume that executive orders providing for NSC involvement in programs requiring such coordinated policies grant the NSC authority independent of the President who presides over it.

Finally, we identify no grant of independent authority in the executive order creating a Steering Committee, chaired by senior representatives of the NSC Staff and the Office of Management and Budget, to establish and review "goals" for interagency sharing and safeguarding of classified information. Exec. Order No. 13,587 § 3, 3 C.F.R. 276, 277 (2012). The order does not contemplate that the Steering Committee will pronounce policies, or even set priorities or standards. Rather, it directs the Steering Committee to "coordinat[e] interagency development and implementation" of such matters. Id. § 3.1 (emphasis added). Such coordination is at the core of the assistance provided to the President by the NSC. It involves no exercise of authority independent of the President or even independent of the agencies endeavoring to coordinate their own efforts. See supra at **[20–21].** This is evident from the fact that, when coordination cannot be

50

achieved in the Steering Committee, the executive order provides for referral to the NSC Deputies Committee in accordance with PPD-1. See Exec. Order No. 13,587 § 3.3(h), 3 C.F.R. at 277. The Deputies Committee exercises no independent authority, see supra at **[43–45]**; rather, it provides yet another forum for still higher ranking officials to resolve coordination challenges. Moreover, when the Steering Committee identifies a need for an overarching policy beyond interagency coordination, the executive order does not authorize the Committee to promulgate that policy itself. Rather, it directs the Steering Committee to recommend promulgation to agencies outside the NSC System authorized to do so, specifically, the Office of Management and Budget or the Information Security Oversight Office of the National Archives and Records Administration. See Exec. Order No. 13,587 § 3.3(e), 3 C.F.R. at 277.

Accordingly, we reject Main Street's argument that the cited executive orders confer on the Council or NSC System any authority that can be exercised independent of the President.

e.    NSC Regulations Do Not Demonstrate Its Current Exercise of Authority Independent of the President

Main Street further argues that the NSC's agency status can be inferred from its promulgation of regulations. See Pacific Legal Found. v. Council on

51

<u>Envtl. Quality</u>, 636 F.2d at 1263 (citing Council on Environmental Quality's promulgation of regulations in holding it agency subject to FOIA).  The cited regulations, however, were all promulgated more than two decades ago and under circumstances that will not admit an inference that the NSC presently exercises any authority independent of the President.

The cited telecommunications regulations, 47 C.F.R. §§ 211.6(c), (g), 213.7(f), (g), were promulgated pursuant to Executive Order No. 12,046 § 4, 3 C.F.R. 158, 163 (1979) (giving NSC responsibility over development of telecommunications policy for emergency situations).  In 1984, however, those sections of Executive Order No. 12,046 relating to the NSC were revoked and superseded by Executive Order No. 12,472 § 4(b)(1), 3 C.F.R. 193, 201 (1985), which left the NSC with a largely advisory role in the telecommunications system, <u>see</u> <u>id.</u> § 2, 3 C.F.R. at 196–98.  Even that was withdrawn when Executive Order No. 12,472 was revoked by Executive Order No. 13,618 § 7(b), 3 C.F.R. 273, 278 (2013).  In sum, at present, the NSC plays no role in the telecommunications system other than to provide a process for interagency coordination consistent with its overall, and sole, advisory function.  <u>See</u> <u>id.</u> § 2.1, 3 C.F.R. at 273–74.

As for regulations promulgated to comply with the Privacy Act, 32 C.F.R. pt. 2102, and an executive order mandating declassification review, 32 C.F.R. pt. 2103; see also 5 U.S.C. § 552a (Privacy Act); Exec. Order. No. 12,065, 3 C.F.R. 190 (1979) (declassification order), these were issued at times when OLC deemed the NSC an agency. Since OLC's 1993 withdrawal of that opinion, see supra at **[25–26]**, the NSC has issued no further regulations.[22]

Main Street nevertheless submits that because certain of these Privacy Act and declassification regulations remain in effect, the NSC continues to exercise independent authority and, therefore, is an agency. We are not persuaded. The extant regulations only outline procedures the NSC will employ in responding to record requests or in classifying or declassifying documents processed by its staff.[23] They impose no duties or restrictions on private persons or government entities, as is usually the case with an exercise of government "authority."

---

[22] The OLC's now withdrawn opinion that the NSC was an agency also explains the NSC's compliance with FOIA until 1994.

[23] See 32 C.F.R. § 2102.2(a) ("The following regulations set forth procedures whereby individuals may seek and gain access to records concerning themselves and will guide the NSC Staff response to requests under the Privacy Act. In addition, they outline the requirements applicable to the personnel maintaining NSC systems of records."); id. § 2103.2 ("The purpose of this regulation is to ensure . . . that national security information processed by the National Security

Accordingly, we conclude that the NSC's past promulgation of regulations cannot support a conclusion that it currently exercises any authority independent of the President or performs any function but to advise and assist the President.

### f. Reported NSC System Actions

Main Street submits that third-party reports of NSC System actions demonstrate that it does not function only to advise and assist the President but, rather, exercises authority independent of him. We are reluctant to locate the "authority" indicative of agency status in action unsupported by an identified legal grant from Congress or the President. We do not pursue that point, however, because the actions cited by Main Street are insufficient to demonstrate agency status in any event.[24]

Main Street submits that then-Homeland Security Advisor John Brennan's responses to Senate questions about the selection of drone targets demonstrate

Council Staff is protected from unauthorized disclosure, but only to the extent, and for such period, as is necessary to safeguard the national security.").

[24] To the extent Main Street argues that the cited actions raise an inference that classified executive orders exist granting the NSC System independent authority, it effectively invites an inquiry into the discoverability of classified materials, which is not appropriate where pleadings otherwise fail to state a plausible claim. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (holding that complaint must plead "factual content that allows the court to draw [a] reasonable inference" supporting its claim, and plaintiff is not entitled to discovery to satisfy this requirement).

that the NSC System exercises authority independent of the President. In fact, the record is to the contrary. Asked who within the Administration makes the final determination to launch a drone strike against an American citizen target, Brennan replied that "[t]he process of deciding to take such an extraordinary action would involve legal review by the Department of Justice, as well as a discussion among the departments and agencies across our national security team, including the relevant National Security Council Principals <u>and the President</u>." John Brennan, <u>Responses to Posthearing Questions</u> 5 (2013) (emphasis added), <u>available at</u> http://1.usa.gov/1fp6lki. Far from demonstrating authority exercised independent of the President, the described process manifests the very function of advising the President in connection with the exercise of his authority, as envisioned by Congress in establishing the NSC and by the President in organizing the NSC System.[25]

---

[25] Main Street maintains that even if the President "ultimately approves" drone strike targets, the "authority" wielded by NSC committees in compiling target lists is so significant as to compel finding the NSC System an agency. This ignores the relevant <u>Soucie</u> inquiry, which asks not whether advice given to the President is significant, but only whether it is, in fact, advice. Nothing in the record cited by Main Street indicates that any part of the NSC System exercises drone-attack authority independent of the President.

In a letter submitted before oral argument, see Fed. R. App. P. 28(j), Main Street also cites the partially declassified 500-page summary to a classified 7,000-page Senate Intelligence Committee Report on the use of enhanced interrogation techniques under the administration of President George W. Bush. From this mass of material, Main Street highlights a single statement, attributed to CIA records, that in July 2004, the NSC Principals Committee agreed that the "'CIA was authorized and directed to utilize'" enhanced interrogation techniques on detainee Janat Gul. Appellant's Fed. R. App. P. 28(j) Letter, Feb. 23, 2015, at 1 (emphasis omitted) (quoting Sen. Select Comm. on Intelligence, Committee Study of the Central Intelligence Agency's Detention and Interrogation Program—Executive Summary ("Executive Summary") 344–45 (2014), available at http://1.usa.gov/1RUx1uY). Main Street submits that this was a formal authorization that the Principals Committee granted independently of the President because "the President does not sit" on that Committee, and because "the President was not even briefed on 'enhanced interrogation techniques' until April 2006." Id. The quoted statement from the CIA report is too slender a reed to support Main Street's contention.

First, insofar as Main Street's argument depends on presidential ignorance, the only cited support for this premise is the Summary's observation that "CIA records indicate that the first CIA briefing for the President on the CIA's enhanced interrogation techniques occurred on April 8, 2006." Executive Summary 40. But as the Summary elsewhere states, the CIA had earlier—and repeatedly—briefed a host of presidential advisors on the matter, including the Vice President, several cabinet members, the President's National Security Advisor, White House Counsel, and various White House staffers. See id. at 38, 115–16, 119. Precedent does not permit an assumption that all these officials kept the President in the dark about CIA interrogation, much less that they did so for four years while the Principals Committee exercised independent authority in this area. See United States v. Armstrong, 517 U.S. 456, 464 (1996) (holding that "in the absence of clear evidence to the contrary, courts presume that [government officials] have properly discharged their official duties")[26]; see generally Ashcroft v. Iqbal, 556 U.S. 662, 681–82 (2009) (holding that inference of

---

[26] See also George W. Bush, Decision Points 168–71 (2010) (stating that, in 2002, President was informed of enhanced interrogation techniques and personally decided which would be permitted or forbidden).

proscribed intent not plausible where there is more likely explanation for challenged conduct).

Further, and more important, the quoted CIA report is insufficient plausibly to allege the NSC's exercise of authority independent of the President. The report asserts that the Principals Committee agreed that the CIA was "authorized and directed" to utilize enhanced interrogation. But "authorized and directed" by whom? We have already explained how presidents have organized the NSC System, including the Principals Committee, not to exercise independent authority, but to advise them in providing for national security and to assist in ensuring coordinated implementation of presidential policies across government departments. Thus, we will not readily assume that any part of the NSC System has overreached its function. See United States v. Armstrong, 517 U.S. at 464. Specifically, we will not assume that when any part of the NSC System concludes that a department is authorized and directed to take action that it is the NSC itself that is authorizing and directing the action rather than simply communicating that the proposed action is authorized and directed by presidential policies.

That caution is reinforced here by the Executive Summary's report that it was the President's National Security Advisor who initially approved the 2004 interrogation at issue, before proposing that the CIA present the matter to the Principals Committee for "additional guidance." Executive Summary 135–36. The Committee, in turn, directed the Justice Department to provide the CIA with a legal opinion, which the Attorney General did, acting on his own authority as the nation's chief law enforcement officer. See id. at 136 (reporting Attorney General's opinion that nine of proposed interrogation techniques comported with Constitution and treaty obligations). These circumstances, where initial approval is conveyed by a presidential advisor not held to exercise authority independent of the Chief Executive, see Kissinger v. Reporters Comm. for Freedom of the Press, 445 U.S. at 156, and where the NSC, through its Principals Committee, then coordinates among various departments, do not manifest the Committee's exercise of any authority independent of the President.

Accordingly, the actions Main Street attributes to the NSC System do not raise a plausible inference of independent authority so as to make the NSC an agency subject to the FOIA.

In sum, because the Council and the NSC System function solely to advise and assist the President and exercise no authority independent of the President, the NSC does not constitute an agency subject to the FOIA. We, therefore, conclude that, insofar as Main Street sues under the FOIA to compel the disclosure of agency documents, its complaint against the NSC was properly dismissed.

F. Because the FOIA Agency Requirement Does Not Implicate Subject-Matter Jurisdiction, the Complaint Was Correctly Dismissed on the Merits

To dismiss a claim on the merits, or to affirm such dismissal, a court must have jurisdiction. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94–95 (1998). The NSC argued before the district court that a court has subject-matter jurisdiction to hear and decide FOIA claims only if the party from whom disclosure is sought is, indeed, an agency. We disagree. Absent agency, a court properly dismisses a FOIA claim on the merits, not for lack of subject-matter jurisdiction.

The FOIA states, in relevant part, as follows:

On complaint, the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, has jurisdiction to enjoin the agency from

60

> withholding agency records and to order the production of any agency records improperly withheld from the complainant.

5 U.S.C. § 552(a)(4)(B) (emphasis added).

Although the statute uses the term "jurisdiction," the Supreme Court has cautioned that "[j]urisdiction . . . is a word of many, too many, meanings." Steel Co. v. Citizens for a Better Env't, 523 U.S. at 90 (internal quotation marks omitted). Some statutes use "jurisdiction" to reference subject-matter jurisdiction, that is, a court's "statutory or constitutional power to adjudicate the case." Id. at 89. Other statutes, however, use "jurisdiction" to "specify[] the remedial powers of the court." Id. at 90 (emphasis omitted). The latter use does not implicate subject-matter jurisdiction. See id.

Based on its text, we construe § 552(a)(4)(B) to reference remedial power, not subject-matter jurisdiction. The highlighted language does not speak to the court's ability to adjudicate a claim, but only to the remedies that the court may award. See id. at 91–92 (rejecting "principle that a statute saying 'the district court shall have jurisdiction to remedy violations [in specified ways]' renders the existence of a violation necessary for subject-matter jurisdiction" (brackets in original)).

61

Admittedly, the Supreme Court has previously referred to § 552(a)(4)(B) as jurisdictional. See United States Dep't of Justice v. Tax Analysts, 492 U.S. 136, 142 (1989); Kissinger v. Reporters Comm. for Freedom of the Press, 445 U.S. at 150. In those cases, however, the Court appears to have used the term in the sense of remedial power rather than subject-matter jurisdiction. See United States Dep't of Justice v. Tax Analysts, 492 U.S. at 142 (discussing "jurisdiction to devise remedies to force an agency to comply with the FOIA's disclosure requirements"); Kissinger v. Reporters Comm. for Freedom of the Press, 445 U.S. at 150 (discussing "[j]udicial authority to devise remedies and enjoin agencies"). Moreover, in Steel Co., the Supreme Court held that prior opinions referring to statutes as "jurisdictional" without indicating that they meant subject-matter jurisdiction, or whether the jurisdictional treatment made a substantive or procedural difference, "have no precedential effect." Steel Co. v. Citizens for a Better Env't, 523 U.S. at 91. Accordingly, the Court's earlier descriptions of § 552(a)(4)(B) as jurisdictional are not controlling here.

Because § 552(a)(4)(B) does not implicate subject-matter jurisdiction, we conclude that the district court properly dismissed the complaint on the merits pursuant to Fed. R. Civ. P. 12(b)(6), and we affirm that judgment.

G. The District Court Did Not Abuse Its Discretion in Denying Discovery

In opposing dismissal, Main Street argued that the district court could easily conclude from publicly available materials that the NSC was an agency subject to the FOIA. If the district court was inclined otherwise, however, Main Street sought sweeping discovery into "the complete scope of" the NSC's "current powers and responsibilities." Pl.'s Opp'n to Mot. to Dismiss 19. The district court agreed with Main Street that publicly available materials were "wholly sufficient for a proper adjudication" of the agency question, but not with the conclusion Main Street urged therefrom. Main St. Legal Servs. v. Nat'l Sec. Council, 962 F. Supp. 2d at 478 n.4. Accordingly, it granted the NSC's motion for dismissal, but denied Main Street further discovery. We review a denial of discovery only for abuse of discretion, see Allied Mar., Inc. v. Descatrade SA, 620 F.3d 70, 76 (2d Cir. 2010), and we identify no such abuse here.

A plaintiff who has failed adequately to state a claim is not entitled to discovery. See Ashcroft v. Iqbal, 556 U.S. at 686 (holding that where complaint fails pleading requirements, plaintiff "is not entitled to discovery, cabined or otherwise"); see also Neitzke v. Williams, 490 U.S. 319, 326–27 (1989) (stating that

Fed. R. Civ. P. 12(b)(6) "streamlines litigation by dispensing with needless discovery and factfinding").

To state a claim for relief under 5 U.S.C. § 552(a)(4)(B), a plaintiff must plausibly allege, among other things, that the defendant is an agency subject to the FOIA. Where, as here, the defendant is a unit within the Executive Office of the President, Main Street's conclusory pleading of agency status was insufficient. See Ashcroft v. Iqbal, 556 U.S. at 678; see also Compl. ¶ 5 ("Defendant National Security Council . . . is an agency within the meaning of 5 U.S.C. § 552(f)(1)."). To the extent Main Street pointed to publicly available materials to support its agency allegations, we have just explained why those materials do not admit a plausible claim. In the absence of a plausible claim of agency, the district court acted within its discretion in granting dismissal without affording Main Street discovery. See Ashcroft v. Iqbal, 556 U.S. at 686; Podany v. Robertson Stephens, Inc., 350 F. Supp. 2d 375, 378 (S.D.N.Y. 2004) (Lynch, J.) ("[D]iscovery is authorized solely for parties to develop the facts in a lawsuit in which a plaintiff has stated a legally cognizable claim, not in order to permit a plaintiff to find out whether he has such a claim, and still less to salvage a lawsuit that has already been dismissed for failure to state a claim.").

The cases Main Street cites that have allowed discovery on a defendant's agency status are inapposite. <u>Citizens for Responsibility & Ethics in Washington v. Office of Administration</u>, No. CIV.A.07-964 (CKK), 2008 WL 7077787 (D.D.C. Feb. 11, 2008), allowed discovery on the theory that agency status was arguably jurisdictional, <u>see</u> <u>id.</u> at *2 (noting liberal standard for allowing jurisdictional discovery). We have here rejected that view of the FOIA's agency requirement. As for <u>Armstrong v. Executive Office of the President</u>, 877 F. Supp. 690 (D.D.C. 1995), <u>rev'd</u>, 90 F.3d 553 (D.C. Cir. 1996), the motion to dismiss on the basis that the NSC was not an agency, which the court treated as a motion for summary judgment, was not filed until after discovery had occurred, <u>see</u> <u>id.</u> at 697 & nn. 7–8.

Accordingly, we identify no abuse of discretion by the district court.

## III. <u>Conclusion</u>

To summarize, we conclude as follows:

1. The NSC is not an agency subject to the FOIA because both the Council itself and the NSC System (a) function only to advise and assist the President in performing his national security responsibilities and (b) exercise no authority independent of the President.

2.      The absence of an agency defendant supported the district court's dismissal of this FOIA action on the merits, see Fed. R. Civ. P. 12(b)(6), rather than for lack of jurisdiction, see Fed. R. Civ. P. 12(b)(1), because the reference to "jurisdiction" in 5 U.S.C. § 552(a)(4)(B) implicates a court's remedial powers, not its subject-matter jurisdiction.

3.      Because plaintiff's complaint failed to state a claim, the district court acted within its discretion in granting dismissal without affording discovery.

The judgment of the district court is, therefore, AFFIRMED.

66

WESLEY, *Circuit Judge*, concurring:

I concur in Judge Raggi's opinion because I am reluctant to deviate from the conclusions reached by the Office of Legal Counsel and the D.C. Circuit concerning the question before us, which have been in effect for over twenty years, and which Congress has declined to overturn in all that time. *See Freedom of Information Act (5 U.S.C. § 552)—Nat'l Sec. Council—Agency Status Under FOIA*, 2 Op. O.L.C. 197 (1978), *withdrawn by* Memorandum from Walter Dellinger, Acting Ass't Att'y Gen., Office of Legal Counsel, to Alan J. Kreczko, Spec. Ass't to the President and Legal Adviser, Nat'l Sec. Council (Sept. 20, 1993); *see also Armstrong v. Exec. Office of the President*, 90 F.3d 553 (D.C. Cir. 1996).

I completely agree with my colleagues that there is no doubt that the core function of the National Security Council proper is a purely advisory one. The Council meets to give advice to the President, who chairs its meetings, and who is the sole "decider" on the questions that come before the Council. The question becomes more complicated, however, when one looks not just at the Council but at the entire NSC System—as we all agree we must do in this case. Subsections of the National Security Act establish Committees that do not include the President but are nonetheless authorized to, among other things, "establish[] priorities," "establish[] policies," "coordinate policies of the United States," and

"direct activities of the United States Government." 50 U.S.C. § 3021(g)–(i). These functions sound like those of a government agency that has authority to act on important matters. Moreover, Congress created and empowered these NSC Committees over the express objection of the President. *See* Presidential Statement on Signing the Intelligence Authorization Act for Fiscal Year 1997, 2 Pub. Papers 1813 (Oct. 11, 1996).

The majority opinion carefully reviews the statutory language in question and concludes those sections can be understood only in the context of the core function of the Council to which the Committees and their staffs report—to act as an advisor to the President on national security matters. There is considerable force to that analysis. Furthermore, the notion that the purely advisory Council might somehow morph into an agency by reason of authorizing statutes for its subunits seems, frankly, peculiar, particularly since it is not clear whether these subunits are actually populated and functioning. We are not in the habit of making law from shadows.

When Congress last spoke to this question, it seemed poised to make FOIA applicable to all important units of the Executive Office of the President. In an ambiguous last-minute compromise, it drew back from that result, indicating

instead that some units were sufficiently advisory, sufficiently close to the President, and sufficiently lacking in independent authority that they should remain exempt from FOIA. For over twenty years, the Executive Branch and the Court of Appeals that most frequently interacts with FOIA as applied to the chief offices of government have concluded that the NSC is one of those exempt units, and as noted above, that conclusion apparently has been accepted by the Congress without much controversy. Whether that conclusion is wise policy, or whether it accurately captures the intent of the Congress in adopting the FOIA amendments, is best considered a political issue for Congress and the President, not for this Court.